2013-1565

# United States Court of Appeals
# for the Federal Circuit

STEPHEN P. TROY, JR.,

*Plaintiff-Appellant,*

*v.*

SAMSON MANUFACTURING CORPORATION,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of Massachusetts in case no. 11-CV-10384, Judge William G. Young.*

## BRIEF FOR PLAINTIFF-APPELLANT
## STEPHEN P. TROY, JR.

DAMIAN R. LAPLACA
NELSON KINDER + MOSSEAU PC
Two Oliver Street
Boston, MA 02109
(617) 778-7500 Tel.
(617) 778-7501 Fax
dlaplaca@nkmlawyers.com

*Counsel for Plaintiff-Appellant*

NOVEMBER 14, 2013

**United States Court of Appeals**
**for the Federal Circuit**
*Troy v Samson Manufacturing Corp., LLP,* 2013-1565

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant, Stephen P. Troy, Jr., certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

     Stephen P. Troy, Jr.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     None

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

     Nelson Kinder + Mosseau PC (Damian R. LaPlaca); Donovan Hatem LLP (Damian R. LaPlaca - no longer with firm; Sarah K. Wiley - no longer with firm; Pamela Selvarajah - no longer on case; Patricia Gary - no longer on case); Lando & Anastasi, LLP (Ann Lamport Hamitte; Thomas P. McNulty)

<u>November 14, 2013</u>             <u>/s/ Damian R. LaPlaca</u>
                                    Damian R. LaPlaca
                                    Nelson Kinder + Mosseau PC
                                    *Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

*Page*

Certificate of Interest ...................................................................................i

Table of Authorities ......................................................................................v

Statement of Related Cases.........................................................................x

Statement of Jurisdiction.............................................................................1

Statement of the Issues................................................................................1

Statement of the Case..................................................................................2

Statement of the Facts.................................................................................3

    1.   The Claims at Issue..............................................................................3

    2.   The Competing Patent Applications...................................................5

    3.   The State Court Action .......................................................................7

        A. Samson Disavowed Inventing Anything Other than the Detent. ..............7

        B. The State Court Determined that Troy Designed the M.R.F. ...................8

        C. Since Samson Exhausted All Appeals, There is a Final Judgment
           in the State Court Action. ......................................................................10

        D. In Post-Trial Motions, Samson Disavowed Inventing Any Part of
           the M.R.F..................................................................................................11

    4.   The BPAI Proceedings ......................................................................12

        A. Samson Obtained the Benefit of Senior Party Status by Filing its
           Provisional Application Using Troy's Drawings and Images.................12

        B. Troy Sought to Overcome the Presumption by Showing on the
           Merits that Samson Filed its Provisional Application Using Troy's
           Drawings and Images. ............................................................................13

        C. In the BPAI Proceedings, Troy Presented Evidence of Samson's
           Inequitable Conduct................................................................................15

D. Troy Submitted Proof in the BPAI of Prior Conception and Two Timeframes for Prior Reduction to Practice. ...........................................16

E. The BPAI Decision.................................................................................18

5. The District Court Proceedings. ...................................................................22

A. Troy Sought to Supplement the Record According to 35 U.S.C. § 146. .....................................................................................................22

B. The District Court Allowed the Deposition of Cass Chin.......................23

C. Troy Filed Supplementary Affidavits and Testimony. ...........................25

D. The March 30 Hearing Was Designed Only to Address the Supplemented Record, and Was Not a Hearing on the Merits. ...............26

E. The Supreme Court Ruled in *Kappos v. Hyatt*.......................................28

F. The District Court "Administratively Closed" the Case for Ten Months Before it Issued its Decision. ......................................................29

G. The District Court's Decision.................................................................29

Summary of the Argument.........................................................................................30

Argument...................................................................................................................32

1. This Court Reviews a District Court's Conclusions of Law *De Novo*..........32

2. The District Court Applied the Incorrect Standard of Review in Affirming the BPAI's Decision to Cancel Claims 1-13 of Patent No. 7,216,451. ...................................................................................................32

A. *Kappos v. Hyatt* Established a New Standard of Review. ......................32

B. *Kappos v. Hyatt* Applies Here.................................................................33

C. The District Court Erred In Applying The Substantial Basis Test. .........34

D. District Court Erred in Refusing to Accept the Conley and Chin Evidence. ................................................................................................37

E.  The District Court Erred as a Matter of Law in Concluding that the Issue of Inequitable Conduct was not Raised Before the BPAI by Troy .................................................................................39

    i.   The District Court Applied the Wrong Standard. ...............................39

    ii.  Troy Raised the Issue of Inequitable Conduct Substantively Throughout the BPAI Proceedings. ....................................................40

F.  Application of the Correct Standard Resolves Actual Reduction to Practice in Troy's Favor. ...........................................................................42

3.  The District Court Erred as a Matter of Law in Concluding that Troy Failed to Demonstrate Prior Conception of the M.R.F. ................................43

A.  The Beaudet Drawings Corroborated the Upper Portion, the Lower Portion, Lug Rails and the Clamping Assembly as of June or July, 2003. ..........................................................................................................44

B.  Troy's Emails to Samson and Anthony Lawrence Further Corroborated Troy's Conception of the Clamping Assembly on July 2, 2003 .................................................................................................46

C.  The Affidavit of John Chudzik Corroborates Troy's December 2003/January 2004 Design of the Detent, the Final Element of Troy's M.R.F. .......................................................................................48

4.  The District Court Erred as a Matter of Law in Concluding That Troy Failed to Demonstrate that Samson Derived the M.R.F. From Troy. ...........50

A.  Collateral Estoppel Precluded the District Court From Finding Samson Did Not Derive Its Claimed Invention From Troy. ....................50

B.  The Evidence Before the District Court Proved Samson Derived Its Claimed Invention From Troy. ...............................................................54

5.  The District Court Erred as a Matter of Law in Concluding That Troy Failed to Demonstrate That Samson's Reduction to Practice of the Subject Invention Inured to the Benefit of Troy. ..........................................54

6.  The District Court Decision Should be Voided as Having Been Entered During Samson's Bankruptcy. ..........................................................55

7.     The USPTO's Issuance of a Patent to Samson Should be Voided Since it Was Issued by Mistake. ..................................................57

8.     If the Issuance of the '304 Patent is Not Voided, Troy's Motion to Amend Complaint Should Be Allowed. ........................................59

Conclusion and Relief Sought .................................................................59

Addendum

     Memorandum and Order, April 30, 2013 (Docket No. 67).........................A1

     Electronic Order, June 11, 2013 (Docket No. 80).....................................A25

     Final Judgment, July 15, 2013 (Docket No. 87) ......................................A27

     U.S. Patent No. 7,216,451 ........................................................................A44

     Decision of the Board in Troy v Samson, Interference No. 105,698, January 6, 2011 (Paper No. 203) ...........................................................A1362

     Judgment of the Board in Troy v Samson, Interference No. 105,698, January 6, 2011 (Paper No. 203) ...........................................................A1391

Certificate of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
   567 F.3d 1366 (Fed. Cir. 2009) ...................................................... 22, 35, 36, 38

*Allen v. McCurry*,
   449 U.S. 90 (1980) ................................................................................... 54

*Allergan, Inc. v. Sandoz Inc.*,
   726 F.3d 1286 (Fed. Cir. 2013) ............................................................... 32

*AlphaVax, Inc. v. Novartis Vaccines & Diagnostics, Inc.*,
   719 F. Supp. 2d 156 (D. Mass. 2010) ..................................................... 34

*Blonder-Tongue Laboratories, Inc. v. Univ. of Illinois Foundation*,
   402 U.S. 313 (1971) ................................................................................. 54

*Brand v. Miller*,
   487 F.3d 862 (Fed. Cir. 2007) ......................................................... 50, 54

*Cell Genesys Inc. v. Applied Research Sys. ARS Holding, N.V.*,
   499 F. Supp. 2d 59 (D. Mass. 2007) (Wolf, J.), ..................................... 36

*Conservolite, Inc. v. Widmayer*,
   21 F.3d 1098 (Fed. Cir. 1994) .................................................... *passim*

*Fregeau v. Mossinghoff*,
   776 F.2d 1034 (Fed. Cir. 1985) .............................................................. 38

*Genentech, Inc. v. Chiron Corp.*,
   220 F.3d 1345 (Fed. Cir. 2000) .............................................................. 54

*HIP Bio, Inc. v. Yung Shin. Pharms. Indus. Co.*,
   600 F.3d 1347 (Fed. Cir. 2010) .............................................................. 59

*Hyatt v. Kappos*,
   625 F.3d 1320 (Fed. Cir. 2010). ................................................ 33, 37, 38

*In re Bright*,
   338 B.R. 530 (B.A.P. 1st Cir. 2006) ...................................................... 55

*In re Soares*,
   107 F.3d 969 (1st Cir. 1997)........................................................ 56, 57

*Int'l Rectifier Corp. v. IXYS Corp.*,
   361 F.3d 1363 (Fed. Cir. 2004) .............................................................50

*Invitrogen Corp. v. President & Fellows of Harvard Coll.*,
   578 F. Supp. 2d 248 (D. Mass. 2008) .................................................35

*Kappos v. Hyatt*,
   132 S. Ct. 1690 (2012)............................................................. *passim*

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*,
   590 F.3d 1326 (Fed. Cir. 2010) ...........................................................36

*Manganella v. Evanston Ins. Co.*,
   700 F.3d 585 (1st Cir. 2012)..............................................................53

*Martin v. Clevenger*,
   11 U.S.P.Q.2d 1399 (Comm'r 1989) .................................................58

*Mazzari v. Rogan*,
   323 F.3d 1000 (Fed. Cir. 2003) ..................................................... 27, 35

*Microsoft Corp. v. i4i Ltd. Partnership*,
   131 S.Ct. 2238 (2011) ................................................................. 33, 43

*Reese v. Verizon California, Inc.*,
   498 Fed. Appx. 980 (Fed. Cir. 2012)....................................................52

*Slip Track Systems, Inc. v. Metal-Lite, Inc.*,
   304 F.3d 1256 (Fed. Cir. 2002) ...........................................................55

*Streck, Inc. v. Research & Diagnostics Systems, Inc.*,
   659 F.3d 1186 (Fed. Cir. 2011) ..................................................... 34, 36

*Troy Indus., Inc. v. Samson Mfg. Corp. (No. 1)*,
   462 Mass. 1108 (2012) .......................................................................11

*Troy Indus., Inc. v. Samson Mfg. Corp.*,
   81 Mass. App. Ct. 1122,
   2012 Mass. App. Unpub. LEXIS 342 (Mar. 21, 2012) ................. 10, 51

*Winner Int'l Royalty Corp. v. Wang,*
    202 F.3d 1340 (Fed. Cir. 2000) ............................................ 22, 33


## Statutes

11 U.S.C. § 362(a)(1) ........................................................... 56

28 U.S.C. § 1738 ................................................................. 54

28 U.S.C. § 1295(a)(4)(C) ........................................................ 1

35 U.S.C. § 141 .................................................................. 22

35 U.S.C. § 145 ............................................................... 1, 28

35 U.S.C. § 146 ............................................................ *passim*

35 U.S.C. § 154(b) ................................................................ 1

35 U.S.C. § 256 ............................................................. 59, 60

35 U.S.C. § 291 ............................................................. 59, 60


## Rules and Regulations

37 C.F.R. § 1.182 ................................................................ ix

37 C.F.R. § 1.56 ................................................................. 14

37 C.F.R. § 41.207(a) ............................................................ 13

37 C.F.R. §41.121(a)(1) .......................................................... 40

37 C.F.R. §41.x .................................................................. 13

Bd. R. 120 ...................................................................... 13

Bd. R. 122 ...................................................................... 15

Bd. R. 204 ...................................................................... 13

Bd. R 204(c) ......................................................................................13

Bd. R. 207(a)(2) ...............................................................................13

BPAI Standing Order 104.2.1 ...........................................................13

BPAI Standing Order 120 ..................................................................13

BPAI Standing Order 121 ..................................................................13

BPAI Standing Order 204 ..................................................................13

BPAI Standing Order ¶10.5 ...............................................................21

Federal Circuit Rule 47.5 ................................................................... ix

MPEP § 2307 .....................................................................................58

## <u>Statement of Related Cases</u>

Pursuant to Federal Circuit Rule 47.5, Troy states that on May 30, 2013, Troy filed a Notice of Appeal to this Court which was docketed as *Stephen P. Troy, Jr. v. Samson Manufacturing Corporation*, 2013-1434. On June 25, 2013, Troy filed an Amended Notice of Appeal which was docketed as *Stephen P. Troy, Jr. v. Samson Manufacturing Corporation*, 2013-1471. The two appeals were consolidated with the first appeal, 2013-1434, being the leading case. On July 29, 2013, Troy filed an Assented-to Motion to Dismiss Appeal. On August 5, 2013, the Federal Circuit granted the motion, dismissing appeals 2013-1434 and 2013-1471. On August 12, 2013, Troy filed a Notice of Appeal which is the appeal presently before this Court. On August 16, 2013, Troy filed in the United States Patent and Trademark Office a Third Party Petition Under 37 C.F.R. § 1.182 to Cancel U.S. Patent No. 8,276,304, which is currently pending.

## Statement of Jurisdiction

Troy's Complaint is based, in part, on 35 U.S.C. § 146, to determine the priority between a patent and a patent application. Therefore, this Court has exclusive jurisdiction of this appeal pursuant to 28 U.S.C. § 1295(a)(4)(C).[1] This is an appeal from a final judgment.

## Statement of the Issues

1.    Whether the District Court applied the correct standard of review in affirming the Board of Patent Appeals and Interference ("BPAI")'s decision to cancel claims 1-13 of Troy Industries, Inc. ("Troy") Patent No. 7,216,451.

2.    Whether the District Court improperly refused to consider Troy's new evidence supporting the argument that the BPAI should not have cancelled claims 1-13 of Patent No. 7,216,451.

3.    Whether the District Court erred as a matter of law in concluding that Troy had not demonstrated priority of invention.

4.    Whether the District Court erred as a matter of law in concluding that Troy did not raise the issue of Samson Manufacturing, Inc.'s ("Samson") inequitable conduct in the BPAI.

---

[1] "The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction ... of an appeal from a decision of ... a district court to which a case was directed pursuant to section 145, 146, or 154(b) of title 35". 28 U.S.C. § 1295(a)(4)(C).

5.     Whether the District Court erred as a matter of law in concluding that Troy failed to demonstrate prior conception of the subject invention.

6.     Whether the District Court erred as a matter of law in concluding that Troy failed to demonstrate that Samson derived the subject invention from Troy.

7.     Whether the District Court erred as a matter of law in concluding that Troy failed to demonstrate that Samson's reduction to practice of the subject invention inured to the benefit of Troy.

8.     Whether the District Court erred in denying Troy's Motion for Reconsideration and Motion to Amend the Complaint.

## Statement of the Case

Stephen P. Troy, Jr. filed the Complaint against Samson Manufacturing Corporation on March 7, 2011, seeking, as Count I, a determination of priority under 35 U.S.C. § 146 following a final decision and order of the Board of Patent Appeals and Interferences ("BPAI") of the United States Patent and Trademark Office ("USPTO") in Patent Interference No. 105,698.[2]    A54-A318.    The interference proceeding involved a dispute over priority between Troy's patent,

_____

[2] For simplification, and unless otherwise indicated, Stephen P. Troy, Jr. and his company, Troy Industries, Inc., are referred to collectively as "Troy".    Scott A. Samson and his company, Samson Manufacturing Corp., are referred to collectively as "Samson".    Where appropriately referenced in the record, Scott A. Samson is referred to as "Mr. Samson".

U.S. Patent No. 7,216,451 ("'451 Patent"), and Samson's U.S. Patent Application No. 11/326,665 ("'665 Application"). A484-A490. Samson is the real party in interest in the '665 Application.[3] A69-A71. The BPAI found that Troy failed to establish priority of the '451 Patent over the '665 Application, A1362-A1389, and cancelled claims 1-13 of the '451 Patent, A1391-A1393. The District Court affirmed the BPAI in all respects, and Troy appeals from the District Court judgment. A63-A64.

## Statement of the Facts

### 1. The Claims at Issue.

This dispute arises from the design and development of a firearm handguard that Troy invented in 2003. A3984. Troy named his invention the Modular Rail Forend ("M.R.F"). A3983. Troy's invention is designed to retrofit to the rifle or carbine solely by clamping to the barrel nut of the weapon. Troy's '451 patent covers the M.R.F. A3984.

At issue is priority of the subject matter described in Claim 3 of Troy's '451 Patent, a handguard having the following five elements which are also depicted in the figure below from the '451 Patent (colors added for emphasis):

---

[3] According to the Samson Notice of Real Party in Interest dated June 18, 2009, Samson Manufacturing, Inc. is assignee of the '665 Application and the real party in interest. A69-A71.

1.      **"an upper portion … configured to engage a top portion of the barrel nut …"**

2.      **"a lower portion … having a top section … and lower side sections …"**

3.      **"a clamping assembly … for engaging a bottom portion of the barrel nut …"**

4.      **"lug rails … project from the inner surface of upper portion at opposing sides and proximate edges thereof, the lug rails extend longitudinally from the proximate forward end to a position proximate the rearward end and include a plurality of gaps[.]"**

5.      **"a detent assembly … carried by the clamp assembly … for engaging the lower portion"**



Samson claimed virtually the identical elements in the '665 Application. A62-A63.

## 2.    The Competing Patent Applications

Troy began conceiving of the M.R.F. in January 2003.  A3984.  On April 9, 2003, before Troy communicated any confidential design information to Samson, Samson signed a Confidentiality Agreement with Troy whereby Samson agreed to keep confidential Troy's information and to use Troy's information only for Troy's purposes.[4]  A3865.  In April 2004, Troy hired Samson to machine certain parts of the M.R.F.  A3866.  Samson had no prior experience in designing or modifying firearms.  A982.  In late 2004, Troy fired Samson for billing and production issues.  A3849-A3850.  In early 2005, Samson began selling the handguard as the M.R.F.S., which stands for "M.R.F. *Samson*".  A3866.  Samson refused Troy's demand to cease and desist from selling the M.R.F.S.  A4000.

On January 13, 2005, Troy filed a complaint against Samson Manufacturing Corp. and Mr. Samson in Suffolk Superior Court in Boston, Massachusetts ("State Court Action"), claiming theft of trade secrets and breach of the Confidentiality Agreement.  A3866.

On February 11, 2005, shortly after commencing the State Court Action, Troy filed a provisional patent application to gain patent protection over the M.R.F., Prov. App. No. 60/652,035.  A3866, A5215-A5228.  On February 10, 2006, Troy filed a utility patent application, Appl. No. 11/351,822, which claimed

---

[4] In May of 2003, Troy informed Mr. Samson that he intended to secure patent protection for his invention and had plans to meet with his patent attorney.  A3334.

priority to its provisional application. A3867, A5511-A5686. On May 15, 2007, the USPTO issued to Troy the '451 Patent. *See* A44-A53, A3867.

Five days after Troy filed the State Court Action, on January 18, 2005, Scott Samson and Kenneth Lankarge, a Samson employee, filed a provisional patent application, Prov. App. No. 60/644,890, directed to the identical M.R.F. ("Samson Provisional Application"). *See* A3867, A5490-A5510. They attached to the Samson Provisional Application *no* drawings of their own. Instead, they attached *only* confidential drawings and images of Troy's invention, including a confidential extrusion drawing of the M.R.F. that Leed Himmel Industries, Inc. ("Leed Himmel") prepared for Troy dated January 10, 2004, which identified Troy as the drawing's owner.[5] A5501. Samson also attached seven confidential images that Robert Conley ("Conley") created from a production model that Troy was selling in 2004. Conley created the images between July 22–24, 2004 and they show all five elements of Troy's invention, the clamping assembly, the upper and lower portions, the lug rails, the detent pin, and the spring for the detent pin.[6] A1821-A1825, A5502-A5508. None of Troy's drawings support any conception or reduction to practice by Samson for any time period.

---

[5] Larry Himmel provided an affidavit in the § 146 action in the District Court attesting that this drawing, and all other drawings it prepared for Troy, are owned by Troy and are for its "exclusive benefit." A3904-A3934.

[6] Conley's testimony is in the BPAI record. *See* A3025-A3031.

3.  **The State Court Action**

    A.  **Samson Disavowed Inventing Anything Other than the Detent.**

The trial in the State Court Action against Samson occurred in June 2007. At trial, Troy sought to introduce the Samson Provisional Application as evidence of Samson's breach of the Confidentiality Agreement and its misappropriation of Troy's confidential M.R.F. design.  A3441.

Samson objected and brought its patent counsel, Stephen Holmes, to the trial to explain to Superior Court Judge Ralph Gants (outside the presence of the jury) the difference between a provisional application and a utility application.  A3416-A3418.  Samson sought to persuade Judge Gants that introducing the Samson Provisional Application would cause it undue prejudice, arguing that a provisional application is merely a placeholder that makes no claims, and the full utility application defines the extent of the applicant's claims.  A3418-A3419.

In his presentation, in order to minimize the negative inference of Samson's use of Troy's confidential drawings, Mr. Holmes conceded that Samson's patent application is limited to only one of the five elements claimed here, namely the detent, or the "spring loaded latch mechanism."  A3418-A3420, A3423-A3425.

> **The Court**:  This is the provisional patent specification.
>
> **Mr. Holmes**:  Yes.  The text of that provisional specification includes information both of the background and of the specific invention that he later made a claim to. … So in the context of trying

7

to explain what the latch mechanism is, it's required that you have to explain what the rail system is.

> **The Court**: Unfortunately, that's not what he says in the first paragraph. The first paragraph reads on top, it says, "Provisional patent specification. Inventor, Scot [sic] Samson."

> Now, you're telling me that this invention is focused solely on the latch? … Is your contention that when he actually applied for the patent, it was only a subset of this that he sought?

> **Mr. Holmes**: Actually, that is our contention.

A3426-A3428.

Mr. Holmes reiterated:

> **The Court**: So basically you're saying that that spring, that the entirety of it is focused on trying to patent that spring.

> **Mr. Holmes**: Yes… what Scott [Samson] has claimed is a forend rail assembly, that includes that specific latch. Not the rail assembly itself, but the rail assembly with a latch.

A3435-A3436. Judge Gants overruled Samson's objection and allowed the Samson Provisional Application into evidence. A3440-A3441.

## B.  The State Court Determined that Troy Designed the M.R.F.

Samson defended the State Court Action on the grounds that (1) Samson, not Troy, designed the M.R.F, and (2) the Confidentiality Agreement did not apply to the M.R.F., but rather only to another project that did not come to fruition. A4003.

At the end of the two-week trial, the jury returned a special jury verdict form in which it found Samson breached the Confidentiality Agreement with Troy.

8

A288-A292, A3679-A3683. On the special verdict form, the jury specifically

rejected Samson's defenses:

> 1. Did Troy Industries, Inc. enter into a Confidentiality Agreement with Samson Manufacturing Corporation? YES X NO ___
>
> 2. Did the Confidentiality Agreement ***cover all confidential information*** that Troy provided to Samson, or was the Agreement limited to information regarding the M-14 SOP-MOD project? ALL X LIMITED ___
>
> 3. Did Troy provide trade secrets or confidential business information to Samson after entering into that Agreement? YES X NO __
>
> 4. Did ***Samson use trade secrets or confidential business information that he learned from Troy*** after entering into the Confidentiality Agreement? YES X NO __
>
> 5. Were the trade secrets or confidential business information that Samson used secret at the time that Samson used them? YES X NO __
>
> 6. Did Samson breach the Confidentiality Agreement by ***using trade secrets or confidential business information that Troy provided after entering into the Confidentiality Agreement to manufacture the Modular Rail Forend*** ("MRF")? YES X NO __

A288-A292, A4003 (emphasis added). The jury awarded Troy $499,500.00 in

damages. A291, A3682. Troy filed the jury verdict in the BPAI. *See* A3679-

A3683. The jury adjudicated the issue of *ownership* of the M.R.F. design in

9

Troy's favor against Samson three years before the January 6, 2011, decision of the

BPAI.[7]

## C. Since Samson Exhausted All Appeals, There is a Final Judgment in the State Court Action.

On March 21, 2012, the Massachusetts Appeals Court affirmed the verdict

and rejected Samson's argument that the Confidentiality Agreement was not

specific enough:

> Samson argues that the confidentiality agreement did not create trade secret protection because it does not specify what is confidential, and that Troy "never spelled out that the MRF was confidential."
>
> . . .
>
> We conclude there was ample evidence to support the jury's principal findings: that Troy provided trade secrets or confidential business information to Samson after entering into a confidentiality agreement; that Samson used the trade secrets and confidential business information; and that *Samson breached the agreement by using the secrets and information to manufacture the MRFS.*

*Troy Indus., Inc. v. Samson Mfg. Corp.*, 81 Mass. App. Ct. 1122 at *1-*2, 2012

Mass. App. Unpub. LEXIS 342 at *7 (Mar. 21, 2012) (emphasis added).

---

[7] The trial court later enjoined Samson from manufacturing, contracting with others to manufacture for sale, soliciting, advertising, accepting orders for sale, or assisting any third party in the design or manufacture of the M.R.F.S.  A4004.

On June 8, 2012, the Massachusetts Supreme Judicial Court denied Samson's request for further appellate review. *Troy Indus., Inc. v. Samson Mfg. Corp. (No. 1)*, 462 Mass. 1108 (2012).

## D. In Post-Trial Motions, Samson Disavowed Inventing Any Part of the M.R.F.

On September 23, 2009, Samson filed a motion in the State Court Action for relief of judgment contending that "newly discovered evidence" showed that Samson did not in fact design the M.R.F, and instead, a non-party, Atlantic Research Marketing Services, Inc. ("A.R.M.S.") designed the M.R.F.[8] A4306-A4327. On November 24, 2010, Superior Court Judge Stephen Neel denied Samson's post-trial motion, finding that "[i]t strains credulity to suggest that Samson realized, only after the trial, he had *not in fact invented* the handguard, and should not have so testified at the June 2007 trial." A4328-A4330 (emphasis added).

This was Samson's second judicial admission disavowing the invention. At trial, Samson disavowed inventing anything other than the detent (the spring-loaded latch mechanism). A3418-A3420. Post-trial, Samson disavowed having invented *any* part of the M.R.F, A4328-A4330.

---

[8] Given Samson's express, repeated disavowal of having invented anything but the detent, and certainly not the handguard itself, Troy argues *infra* that it is entitled to priority on claims 1-2, 6, and 10-11. *See* Argument Section 1(F).

11

4.    **The BPAI Proceedings**

    A.    **Samson Obtained the Benefit of Senior Party Status by Filing its Provisional Application Using Troy's Drawings and Images.**

On August 22, 2007, two months after the State Court Action's jury verdict, Mr. Samson and Mr. Lankarge filed a Request for Interference between claims 1-13 of the '665 Application, A5229-A5489, and claims 3-5, 7-9 and 12-13 of Troy's '451 Patent.   A3868, A5319-A5355.   In direct contraction to the State Court concession in which they claimed only the detent in the Samson Provisional Application, in their Interference Request Mr. Samson and Mr. Lankrage claimed they invented not only the detent, but also the other four elements existing in Troy's drawings that they attached to the Samson Provisional Application.  A5319-A5355.

On June 4, 2009, the BPAI declared an interference, Patent Interference Number 105,698 (the "'698 Interference"), between claims 1-13 of '665 Application and claims 1-13 of the '451 Patent.  *See* A484-A490.

The BPAI accorded Samson the benefit of the date Samson and Lankarge filed the Samson Provisional Application, January 18, 2005, and accorded Troy the benefit of the filing date of its provisional patent application, February 11, 2005. A486-A487, A1366.  As the later-filing applicant, Troy was declared the Junior

12

Party.[9]   A486-A487.   As the Junior Party, Troy carried the burden of demonstrating, by a preponderance of the evidence, an earlier actual reduction to practice in order to establish priority.  Bd. R. 207(a)(2).[10]

> **B.**   **Troy Sought to Overcome the Presumption by Showing on the Merits that Samson Filed its Provisional Application Using Troy's Drawings and Images.**

In the Notice to Declare Interference, the BPAI scheduled a conference call for August 6, 2009, and ordered both parties to file a "list of the motions ... the party intends to file" according to Bd. R. 120 and 204, and BPAI Standing Order paragraphs ("SO ¶") 104.2.1, 120, 204.  A485.

The Notice of Interference, Bd. R 204(c), and SO ¶¶ 121 and 204 require each party to file a list of proposed motions before the BPAI will allow the filing of any motion.  On July 31, 2009, Troy filed its Motions List.  A672-A675.  In its Motions List, Troy requested permission to file three motions relating to Samson's use of Troy's confidential designs in Samson Provisional Application: (1) Troy Substantive Motion 6 (for Judgment of Inequitable Conduct), (2) Troy Miscellaneous Motion 9 (for Discovery on Inequitable Conduct Intent in support of

---

[9] "Parties are presumed to have invented interfering subject matter in the order of the dates of their accorded benefit for each count.  37 C.F.R. § 41.207(a).

[10] Pursuant to the Notice to Declare Interference, "'Bd.R.x' may be used as shorthand for '37 C.F.R. §41.x'" and is so used in the Standing Order.  *See* A484.

the Motion for Judgment of Inequitable Conduct), and (3) Troy Miscellaneous Motion 10 (to Admit Verdict and Testimony in the Prior Litigation (*e.g.*, the State Court Action) in support of Troy Substantive Motions 1, 2, and 6). A673.

On August 6, 2009, Administrative Patent Judge Sally Medley conducted the conference call to address the parties' proposed motions. *See* A681. According to BPAI procedure, the conference call is not transcribed. *See* SO ¶ 123.3. On August 7, 2009, Administrative Patent Judge Medley issued an order authorizing Troy to file only a motion for judgment on the basis of priority and derivation. A681-A689.

Administrative Patent Judge Medley denied Troy's request to file the first two motions on Samson's inequitable conduct, stating "Troy is not authorized to file a motion for inequitable conduct, since it was not explained how the alleged withheld information could be the basis for a prior art rejection."[11]    A682. Regarding Troy's third motion to admit the record in the State Court Action,

---

[11]Administrative Patent Judge Medley appeared to focus only on inequitable conduct as it relates to failure to disclose a third party prior art reference. The wording of Rule 1.56, Duty to disclose information material to patentability, is not so limited: "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office *all information known to that individual to be material to patentability* …." 37 C.F.R. § 1.56 (emphasis added). "Information material to patentability" is, therefore, not limited to prior art references. Presumably, Administrative Patent Judge Medley assumed that Samson's and Troy's activities prior to filing could be adequately addressed in the permitted motions for judgment on the basis of priority (including derivation).

14

Administrative Patent Judge Medley stated, "[a]s explained, it is not necessary for Troy to file a miscellaneous motion to admit verdict and testimony from prior litigation into the record in support of Troy's priority and derivation motion." A682.

## C. In the BPAI Proceedings, Troy Presented Evidence of Samson's Inequitable Conduct.

Troy sought to show Samson's inequitable conduct in the BPAI. Troy also argued on the merits throughout the Priority Motions that Samson improperly attached Troy's confidential drawings and images to claim conception and reduction to practice. For instance, in Troy's Opposition to Samson Priority Motion 1, Troy raised the issue substantively, arguing:

> Pursuant to Br. R. 122, the Junior Party Troy requests that the Senior Party be denied judgment of priority. . . . Troy conceived the subject matter of the count well prior to any alleged date by Samson, disclosed his conception to Samson and others months before Samson's alleged conception date, and the invention was reduced to practice on Troy's behalf no later than the date that Samson identifies as his actual reduction to practice. Accordingly, Troy is entitled to priority, not Samson. . . . Troy disclosed his invention to Samson under the terms of a Confidentiality Agreement that he signed in April 2003. *Samson breached the terms of the Agreement and used what he had learned under that Agreement for his own benefit, including filing the provisional patent application at issue in this interference, Serial Number 60/644,892, for the invention disclosed to him by Troy, using drawings in that provisional application that were made for, and paid for, by Troy.*

*See* A901-A962 (emphasis added).

15

Troy specifically argued in its Opposition to Samson Priority Motion 1, which the BPAI did not consider, that Samson improperly attached Troy's Leed Himmel drawings and Conley images to the Samson Provisional Application. *See* A922 ("Samson's filing of the provisional application was in violation of the Confidentiality Agreement that Mr. Samson filed on April 9, 2003. [] In 2007 a jury found that Samson liable for breech [sic] of contract for violation of that Agreement. [] The drawings submitted by Samson in that provisional application were copies of those prepared by Mr. Conley, who confirmed that the drawings belong to Troy.").

In its Samson Reply 1, which, again, the BPAI did not consider, Samson conceded that "Mr. Samson used drawings from Leed Himmel and Conley in his provisional application and that Troy paid for these drawings" but it does not appear that the BPAI recognized Samson's concession. A1064.

However, as discussed below in Statement of Facts Section 4(E), *infra*, since the BPAI Decision only addressed Troy's Priority Motion 1 (Substitute), it did not consider Samson Priority Motion 1 or Troy's opposition quoted above.

**D.    Troy Submitted Proof in the BPAI of Prior Conception and <u>Two Timeframes for Prior Reduction to Practice.</u>**

In Troy's Priority Statement, Troy submitted that its earliest corroborated date of conception was April 2003, and his earliest corroborated date of reduction to practice was the timeframe of January/February of 2004. A703-A705.

16

However, in reliance on Conley, Troy also offered a later date than the January-February 2004 time-frame. Troy stated that "Although later in time, Mr. Conley testified that his drawings were done for, and billed to, Troy." A972. Conley created the images attached to the Samson Provisional Application between July 22-24 of 2004 from a Troy "production model." A1821-A1825, A5502-A5508.

On October 29, 2009, Troy submitted Troy Priority Motion 1 (Substitute). A757-A780. Troy moved for judgment of priority as the first to conceive and reduce to practice, and for judgment against Samson on the grounds of derivation and inurement. A758. Troy attached as exhibits the identical exhibits it introduced in the State Court Action. *See* A772, A3318-A3578.[12]

Before the BPAI ruled on the merits, on March 23, 2010, Troy twice requested oral argument to explain its evidence on the priority motions. A1071-1073. However, on May 11, 2010, Administrative Patent Judge Medley denied Troy's first motion, stating "The junior party Troy has requested oral argument (paper 65). It is the view of the Board, however, that oral argument is not necessary for a decision on the pending motions." A1348-A1349. The BPAI denied Troy's second the request on June 2, 2010. A1351-A1353, A1355-1357.

---

[12] At the time the BPAI ruled, the Massachusetts Appeals Court had not yet affirmed the jury verdict and judgment, but at the time that the District Court ruled, the Appeals Court had affirmed the jury verdict and judgment.

### E.    The BPAI Decision

In its January 6, 2011 decision ("BPAI Decision"), the BPAI found that Troy failed to establish priority of the '451 Patent over the '665 Application, A1362-A1389, and cancelled claims 1-13 of the '451 Patent, A1391-A1393. The BPAI found it unnecessary to consider Samson's Priority Motion, A782-A785, Troy's Opposition, A901-A962, and Troy's Miscellaneous Motion 2, seeking to exclude certain of Samson's exhibits on which it relied to establish priority, A1127-A1157.

In its Decision, the BPAI overlooked the jury verdict in the State Court Action, the fact that Samson admitted that Conley prepared the "manufacturing drawings for Troy Industries," and that "Mr. Samson used drawings from Leed Himmel and Conley in his Provisional Application and that Troy paid for these drawings." A987-A988.

In several instances in its decision, the BPAI complained that Troy did not sufficiently explain its evidence. Regarding Troy's claim to prior reduction to practice, the BPAI said: "Troy relies on Exhibit 2014 to show that which it allegedly reduced to practice. . . . Neither Troy through its motion, nor Mr. Troy through his [affidavit] testimony, sufficiently explains the contents of Exhibit 2014. . . . throughout its motion, an explanation of how Troy's evidence supports the arguments Troy makes is lacking or missing altogether. . . . Here, Troy does

18

not explain which element(s) of the count is shown by which element(s) of the photographs of Exhibit 2014. . . . It is not apparent to us and we do not find that Exhibit 2014 describes every element of Count I. Troy's argument is not specific or well articulated. . . . Troy does not explain, in any meaningful way, what it means in that regard." A1368-A1371, A1385-A1386.[13]

Despite having twice denied oral argument in which these issues could have been addressed, the BPAI claimed that Troy failed to explain its evidence. The BPAI complained that "[t]here are no apparent dates associated with Exhibit 2014", A1371, but did not discuss other exhibits Troy relied upon to shown reduction to practice. The BPAI also complained that "We do not know to which testing, diligence or reduction to practice Troy is referring." A1386.

The BPAI cited only Troy's primary motion, and overlooked Troy's Reply which stated "it is clear that the parties agree that, to the extent testing was necessary, the prototypes were tested in February 2004 and found to work for the intended purpose." A972.

---

[13] Troy relied on numerous other associated documents that were dated. Among them, Troy relied on Exhibit 2011, an extrusion drawing created by Leed Himmel and faxed to Troy dated January 10, 2004, to prepare the aluminum to make the extrusion, A3349-A3350; Exhibit 2012, numerous extrusion drawings Leed Himmel prepared to machine the handguard parts, all dated in January of 2004, A3351-A3374; and Exhibit 2013, a Leed Himmel invoice for delivery of 500 pounds of aluminum and extrusion die, dated January 9, 2004, A3375-A3376.

The BPAI also complained that invoices from Applied Light lacked "a description of what was engraved" and that "Exhibit 2017 is purportedly a receipt from Applied Light . . . [but] there is not a description of what was engraved." A1372. The BPAI overlooked Samson's admissions that (1) "In early February [2004], Troy brought prototypes to Valley Plating, Inc., in Springfield, Massachusetts for plating with a Hard Coat Aluminum Anodizing, which turns the metal black and provides a hard surface that is wear resistant," and (2) "Troy then brought the prototypes to Applied Light, Inc. for laser engraving. That engraving included the company name, Troy Industries, Inc., as can be seen in the photo in Troy Exhibit 2016; Troy Exhibit 2003, para 25, Troy Exhibit 2017." A986.

The BPAI also complained that Troy "has not explained the significance of" the customer order from the SHOT show, A1372-A1373, without considering Samson's admission that "Troy showed the *prototypes* at the SHOT Show, and took orders from customers for the upcoming production." A987 (emphasis added).

On Troy's claim of prior conception, the BPAI similarly found that Troy did not explain, "in any meaningful way", the evidence to establish prior conception, or that, for instance "the email does not appear to describe any of the specific

elements of the count." *See*, *e.g.*, A1377, A1381. The BPAI then concluded that Troy had not met its burden of proof on conception for any date. A1377-A1381.[14]

The BPAI also rejected Troy's claims that Samson derived its claimed invention from Troy, even though the State Court Action specifically found that Samson used Troy's confidential information and thereby breached the Confidentiality Agreement to create Samson's claimed invention, the M.R.F.S.[15] A1386-A1389. The BPAI then entered judgment against Troy, and ordered that claims 1-13 of the '451 Patent be cancelled. A1391-A1393.[16]

---

[14] Samson argued the same evidence supported its claim to conception. But because the BPAI never reached Samson's Priority Motion, it never ruled that Samson showed prior conception.

[15] The jury adjudicated a purely state law issue on jury instructions from a state court judge, *i.e.*, the scope of and application of the Confidentiality Agreement. The jury specifically rejected Samson's argument that the Confidentiality Agreement applied to different project. A1384-A1386.

[16] Samson's first concession was not before the BPAI when it ruled on January 6, 2011. On December 22, 2010, Troy's counsel contacted the BPAI Paralegal to learn Administrative Patent Judge Medley's availability to schedule the conference required before filing a Miscellaneous Motion, as required by SO ¶10.5, A507, and learned that Administrative Patent Judge Medley was on leave until after the new year. On January 6, 2011, the same day that counsel for both parties planned to discuss Troy's proposed Miscellaneous Motion to bring Samson's concession and Judge Neel's ruling to the BPAI's attention, the BPAI issued its decision. *See* A4350. However, twin concessions were before the District Court, but there is no indication that the District Court considered them in any respect.

5.     **The District Court Proceedings.**

A.     **Troy Sought to Supplement the Record According to 35 U.S.C. § 146.**

Because the BPAI found that Troy did not adequately explain its evidence, Troy timely challenged the BPAI Decision by its Complaint in the District Court pursuant to 35 U.S.C. § 146. Troy's purpose was to take advantage of its statutory right "to take further testimony", to "shor[e] up any evidentiary gaps" evident in the BPAI record, *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379-80 (Fed. Cir. 2009), to obtain *de novo* factual findings, *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1347 (Fed. Cir. 2000), and have credibility issues adjudicated by the District Court. In contrast, a direct appeal to this Court pursuant to 35 U.S.C. § 141 is limited to the record before the BPAI.

Samson did not file a cross-appeal under § 146 over the BPAI's failure to address Samson's own Priority Motion, *i.e.*, whether Samson proved prior conception and/or actual reduction to practice. Nor did Samson seek to introduce any affirmative evidence of its own to prove prior conception and/or actual reduction to practice in Troy's § 146 action. Rather, in the District Court Samson chose only to seek to exclude Troy's evidence. As a result, Samson is limited to the BPAI's constructive reduction to practice date of January 18, 2005.

The District Court held an Initial Scheduling Conference on December 21, 2011, A373-A399, and upon the parties' competing recommendations, entered a

Scheduling Order on January 9, 2012, A400-A420.  The District Court adopted Samson's proposed schedule which bifurcated Count I from the remaining counts of the Complaint and set a highly compressed pretrial schedule and an expedited trial on Count I.  A409.

On February 1, 2012, the District Court entered a Procedural Order scheduling a Final Pre-Trial Conference for February 28, 2012, and ordering the parties to file a Joint Pre-Trial Memorandum on that date.  A437-A439.  In its Procedural Order, the District Court also ordered that "Counsel shall be prepared to commence trial of this action on or **after 3/5/2012**."  A437 (emphasis in original).

In Troy's Recommendations for Scheduling Order, and in its portion of the Joint Pre-Trial Memorandum Troy, indicated its intention to take further testimony.  *See* A323-A324, A3854.  The District Court had so far allowed no discovery.  Samson offered no proposal to the District Court to introduce any testimony or evidence to establish that it conceived of the M.R.F.S. or that it first reduced it to practice.

### B.  The District Court Allowed the Deposition of Cass Chin.

In its effort to shore up evidentiary gaps, Troy located a witness in California named Cass Chin, who owns a website called militarymorons.com. A3938.  Troy had learned that in 2004, Chin conducted a written review of the Troy M.R.F.  Chin's written review and photos of the completed M.R.F. would

23

clearly establish Troy's priority of invention, the issue squarely before the BPAI. Troy noticed his deposition and Samson sought a protective order against the deposition, A5687-A5751. Troy opposed, explaining why the Chin testimony would be admissible according to the existing standard of review under § 146 and how it would establish prior actual reduction to practice, A5752-A5760. The District Court denied the protective order, A5761, and Troy took Chin's deposition in California, the only deposition allowed.

The District Court held the February 28, 2012 Final Pretrial Conference in chambers.[17] A3894. In chambers, the District Court laid out a procedure in which Troy was allowed to file supporting affidavits by March 6, 2012. A3894. Samson did not ask to file any affidavits, and instead, sought to exclude any new evidence of Troy. The District Court directed the parties to file briefs no longer than twenty pages by March 15, 2012. A3894. The District Court scheduled a one-hour, non-evidentiary oral argument on Count I for March 30, 2012. A3894. Following the hearing, the District Court would then determine whether it would permit new evidence, and if so, identify the specific witnesses and evidence it would allow. A4331-A4332.

---

[17] The February 28, 2012 chambers conference was off the record.

24

## C.     Troy Filed Supplementary Affidavits and Testimony.

In compliance with the District Court's plan, on March 6, 2012, Troy filed affidavits from Mr. Troy, Cass Chin, John Chudzik, Anthony Lawrence, Preston Macy, and Larry Himmel.  A3895-A4330.  Troy also attached additional state court deposition testimony of Conley that was not already part of the BPAI records, as an exhibit to Mr. Troy's affidavit.  A4222-A4242.  In its March 15 brief, Troy showed that most of Mr. Conley's testimony in the State Court Action was already in the BPAI record as Samson Exhibit 1086.  A4337, fn. 9.  Through these affidavits, Troy sought to answer the evidentiary questions raised in the BPAI Decision.

For instance, Chin corroborated that Troy's reduction to practice was no later than June 16, 2004, which predates "Samson's earliest accorded benefit date [of] 18 January 2005."  *See* A1367, A3938-A3982, A4468.

The Conley State Court deposition testimony supplemented the Conley deposition transcripts and his images and drawings already in the BPAI record, A3025-AA3031.  Conley testified that he signed a Design Agreement with Troy which was for Troy's exclusive benefit, that Troy would be the owner of the drawings that Conley prepared, and that he created his manufacture drawings from an "actual production" M.R.F. handguard that he had seen in July 2004.  A4222-A4242.

Macy's affidavit answered the questions the BPAI raised about what Applied Light engraved, and he attested that he "performed engraving services on a number of versions of Troy's prototype of its" M.R.F, that he engraved Troy's name, telephone number, the words "patent pending" on Troy's M.R.F. on February 9, 2004. A3895-A3899.

Lawrence and Chudzik collectively corroborated that Troy conceived of a handguard design which used a two piece clamp design and spring-loaded detent system to attach the handguard to the barrel nut. A3900-A3903; A3935-A3937. Himmel testified that "[i]n early 2004 ... Leed Himmel prepared the extrusion drawings and extruded material for Troy Indus. alone, and for the exclusive benefit of Troy Indus." A3904-A3934.

Finally, Troy offered a lengthy affidavit which detailed every step it took to conceive of and reduce to practice each of the five elements of his M.R.F., and to introduce additional evidence that was not available to the BPAI. A3983-A4330.

> **D.** **The March 30 Hearing Was Designed Only to Address the Supplemented Record, and Was Not a Hearing on the Merits.**

On March 30, 2012, the District Court held the one-hour, non-evidentiary oral argument on Count I, which the District Court described on the docket sheet as

a "trial" ("March 30 Hearing").[18] A4449-A4490. Troy concluded its oral presentation to the District Court stating that:

> [Chin] establishes that Mr. Troy's handguard was reduced to practice no later than June 16, 2004, which is at least six months before Samson's purported reduction to practice date of January 18, 2005. What I have on the board, on the screen right now is [sic] his photographs that Mr. Chin took of the Troy handguard on June 16, 2004, showing that all elements existed as of that date.

A4468.

Rather than address any of Troy's additional evidence, the District Court immediately took up the issue of the standard of review, suggesting that "if I don't take new testimony then I have to apply the substantial evidence test? Isn't that Mazzari v. Rogan, a Federal Circuit case." A4468-A4469. Troy responded, "No, your Honor, I think we've cited the most recent cases which say that is not the standard. The standard is you must allow new testimony to, as the Federal Circuit has said, shore up evidentiary gaps that are evident in the record." A4469.

At the end of the hearing, the District Court notified the parties that further briefs may be filed on the issues raised in the case, including whether the District Court should rule on whether to allow the new evidence before or after the

---

[18] The March 30 Hearing was not a trial; no testimony was taken and no documents were introduced into evidence. Troy submits that it was error for the District Court to not conduct a trial on the merits of his appeal under § 146. The District Court appears to have concluded that this matter was not a trial, since in its Decision it did not refer to the March 30 Hearing as a "trial".

Supreme Court decided *Kappos v. Hyatt*, which concerned the standard of review of appeals brought in district courts under 35 U.S.C. § 145. A4421, A4488. The District Court and parties agreed that the District Court would wait until *Kappos v. Hyatt* was decided. A4488.

### E.    The Supreme Court Ruled in *Kappos v. Hyatt.*

One month later, on April 18, 2012, the Supreme Court ruled in *Kappos v. Hyatt*, 132 S. Ct. 1690 (2012). The Supreme Court affirmed the *en banc* decision of this Court and established a new standard for appeals pursuant to 35 U.S.C. § 145, largely adopting the standard from this Court, and ruling that district courts must accept additional testimony, make *de novo* findings, and give no deference to a decision of the BPAI. *Id.*

On May 11, 2012, Troy provided the District Court with a further Memorandum on the application of *Kappos v. Hyatt* and showed that the District Court must accept the additional evidence Troy proffered by way of affidavits on March 6, 2012. A4521-A4608. Troy argued that if the District Court were to take the additional evidence in a trial, make *de novo* findings, and give no deference to the BPAI, then it should rule that Troy established priority of the '451 Patent over the '665 Application. A4521-A4608.

### F. The District Court "Administratively Closed" the Case for Ten Months Before it Issued its Decision.

On June 20, 2012, the District Court "administratively closed" Troy's § 146 action while it decided how to rule in light of the standard the Supreme Court established in *Kappos v. Hyatt*.[19] A4616-A4617. The District Court stated that "In view of the pendency of an important decision in this case, it is ordered administratively closed. It may be reopened upon motion of either party once that decision issues." A4616-A4617.

### G. The District Court's Decision

On April 30, 2013, the District Court entered a Memorandum and Order on Count I of the Complaint ("District Court Decision") and affirmed the BPAI's decision to cancel claims 1-13 of the '451 Patent.[20] A1-A24. In so ruling, the District Court went beyond the plan it laid out in the February 28, 2012 chambers conference, in which it allowed Troy to file proffered affidavits on new testimony and to hold a hearing on the new testimony. The March 6 affidavits and briefing and March 30 Hearing were only to determine whether the District Court would

---

[19] Troy was unable to find any Rule of Civil Procedure or Local Rule that grants the District Court authority to "administratively close" a case while it decides a pending issue.

[20] The District Court's docket sheet does not show that the District Court "administratively re-opened" this matter. Rather, the District Court appears to have simply ruled without reopening this case.

admit Troy's new evidence. Instead, the Court rendered a decision on the merits of the entirety of Troy's § 146 Action, despite the lack of trial or a pending summary judgment or other dispositive motion. Neither the March 6 briefing nor the March 30 Hearing included any discussion of whether the existing evidence that was before the BPAI, in tandem with Troy's new evidence, was sufficient to show Troy first conceived and/or reduced its invention to practice. The District Court ruled without giving Troy the opportunity to explain the evidence the BPAI found lacking.

In its Decision, the District Court ruled lock-step with the BPAI, did not make *de novo* findings, and specifically excluded the Chin Affidavit and Conley deposition testimony. A1-A24. On May 1, 2013, the District Court entered judgment. A4620.

## Summary of the Argument

The District Court fundamentally erred because it applied the incorrect standard to Troy's § 146 action. The District Court acted as a reviewing court and affirmed the BPAI Decision using the deferential substantial basis test, it excluded Troy's proffered new testimony and evidence, and it made no *de novo* findings. Had the District Court applied the correct, new standard the Supreme Court established in *Kappos v. Hyatt*, it would have found that Troy first conceived of the M.R.F. by December of 2003/January of 2004 and that it first reduced to practice

30

its invention by July of 2004, which predates Samson's accorded reduction to practice date by six months. Applying the correct standard would have resulted in a judgment in favor of Troy on the issue of priority and reinstating its '451 patent.

Alternatively, the District Court should have afforded Troy a trial on the merits to consider Troy's new evidence *de novo*, in tandem with the existing record in the BPAI.

The District Court also erred in failing to apply collateral estoppel to the State Court judgment, which would have resulted in a judgment in favor of Troy that Samson derived its alleged invention from Troy and that all of Samson's work inured to the benefit of Troy.

The District Court further erred by entering its Decision during the pendency of Samson's bankruptcy in violation of the automatic stay and, therefore, the District Court Decision should be voided.

Finally, because the Patent and Trademark Office issued to Samson Patent No. 8,276,304 in the mistaken belief that a stipulation of dismissal involving a separate party resolved the § 146 action in Samson's favor, Samson's patent should be voided. If this Court declines to void Samson Patent No. 8,276,304, Troy must be allowed to amend its complaint to add additional causes of action predicated upon the patent's issuance.

## Argument

### 1.     This Court Reviews a District Court's Conclusions of Law *De Novo*.

Because the District Court applied the incorrect legal standard in Troy's § 146 Action, the District Court Decision is entitled to no deference and the standard of review is *de novo*.  *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1290 (Fed. Cir. 2013) ("We review the district court's ... conclusions of law *de novo*.).  Further, since the District Court acted as the reviewing court over the BPAI findings, rather than make findings *de novo*, and since it excluded evidence it should have admitted under *Kappos v. Hyatt*, 132 S. Ct. 1690 (2012), its findings stem from the application of an incorrect governing standard and they too are entitled to no deference.

### 2.     The District Court Applied the Incorrect Standard of Review in Affirming the BPAI's Decision to Cancel Claims 1-13 of Patent No. 7,216,451.

#### A.     *Kappos v. Hyatt* Established a New Standard of Review.

In *Kappos v. Hyatt*, the Supreme Court held that a patent applicant's right to introduce new evidence in a proceeding under 35 U.S.C. § 145 is limited only to the restrictions imposed by the Federal Rules of Evidence and Civil Procedure. 132 S. Ct. at 1700-01.  Moreover, when new evidence is introduced, "the district court must make its own findings *de novo* and does not act as the 'reviewing court' envisioned by the APA." *Id.* at 1696.

32

The Supreme Court further "conclude[d] that the proper means for the district court to accord broad respect to decisions of the USPTO is through the court's broad discretion over the weight to be given to evidence newly adduced in § 145 proceedings." *Id.* at 1700. The fact finder always has discretion in weighing evidence. However, the decision in *Microsoft Corp. v. i4i Ltd. Partnership*, which *Kappos v. Hyatt* cited at 1700, makes clear that new evidence should carry more weight because the fact finder did not have all the facts before it:

> Instead, we understand these cases to reflect the same commonsense principle that the Federal Circuit has recognized throughout its existence—namely, that new evidence supporting an invalidity defense may 'carry more weight' in an infringement action than evidence previously considered by the PTO. … Simply put, if the PTO did not have all material facts before it, its considered judgment may lose significant force.

131 S.Ct. 2238, 2251 (2011).

## B. *Kappos v. Hyatt* Applies Here.

*Kappos v. Hyatt* applies to this § 146 proceeding. In the *en banc* decision in *Hyatt v. Kappos*, this Court stated "[a]s sections 145 and 146 both stem from [the same legislation], we have characterized these sections as 'parallel provisions' to be treated similarly." *Hyatt v. Kappos*, 625 F.3d 1320, 1330 (Fed. Cir. 2010) (citing *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1345 (Fed. Cir. 2000)). This Court further stated, "We see no rationale that would justify distinguishing

33

between interferences [§ 146 actions] and ex parte actions [§ 145 actions] for admissibility purposes." *Hyatt v. Kappos*, 625 F.3d at 1330, n.2.[21]

### C.    The District Court Erred In Applying The Substantial Basis Test.

The District Court did not apply the correct governing standard.[22]  It gave *Kappos v. Hyatt* a mere passing reference towards the end of its recitation of the standard.  A6-A9.  It devoted its recitation of the standard by citing to inapplicable pre-*Kappos v. Hyatt* decisions that affirmed the BPAI using the deferential "substantial basis" test, including one of its own decisions.  A6-A9.  It cited its decision in *AlphaVax, Inc. v. Novartis Vaccines & Diagnostics, Inc.*, 719 F. Supp. 2d 156, 162-63 (D. Mass. 2010) (Young, J.) ("Because it is inappropriate to admit new evidence, the Court will review the decision of the Board on the existing

---

[21] In addition, in *Streck, Inc. v. Research & Diagnostics Systems, Inc.*, 659 F.3d 1186, 1190, n.2 (Fed. Cir. 2011), the Federal Circuit reaffirmed that actions under §§ 145 and 146 are "parallel" and are "to be treated similarly".  At the March 30 Hearing, the District Court correctly recognized that "there's jurisprudence out there that says that proceedings under 145 and 146 are cognate."  Samson did not disagree.  A4474.

[22] The District Court also erred by incorrectly stating "Troy initiated interference proceedings against Samson and Kenneth Lankarge by filing a motion with the Board asserting priority of invention."  A3-A4 (citing the BPAI Decision). Samson initiated the interference proceedings by filing a Request for Interference. *See* Statement of Facts Section 4(A), *supra*.

record using the substantial evidence test."), in which the District Court granted summary judgment affirming the BPAI.  A7.

The District Court also relied on another decision from the District of Massachusetts that applied the substantial evidence test, *Invitrogen Corp. v. President & Fellows of Harvard Coll.*, 578 F. Supp. 2d 248, 255 (D. Mass. 2008) (Gorton, J.).  A7.  Similarly, the District Court relied on *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003), the decision it suggested at the March 30 Hearing that requires it to apply the substantial basis test.  A6.

Since all three decisions applied the deferential "substantial basis" standard, rather than a *de novo* review, none is applicable.  Misapplying the standard, the District Court erred in stating that "a Section 146 action does not guarantee the admission of new evidence and live testimony."  A7.

However, Troy in several memoranda[23] to the District Court showed that in 2009, 2010, and again in 2011, the Federal Circuit instructed that § 146 grants parties the right to introduce new evidence:

> Section 146 affords a litigant the option of shoring up evidentiary gaps that may have been evident by the end of the inter partes interference procedure. In this case, the Board explicitly notified Agilent of such gaps, and Agilent endeavored to fill them. Thus, *Section 146 permits such new evidence*…

---

[23] *See*, *e.g.*, A4331-A4351.

*Agilent Techs, Inc.*, 567 F.3d at 1379-80 (emphasis added); *Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1332 (Fed. Cir. 2010) ("§ 146 grants parties the *right to present new testimony* and requires the court to review the Board's factual findings."); *Streck, Inc.*, 659 F.3d at 1190–1 (§ 146 provides that the civil action is "without prejudice to the right of the parties to take further testimony").

The District Court also erred in stating that "the underlying factual determinations are reviewed for clear error." A6. That is incorrect. The district court does not act as a reviewing court at all, and instead makes *de novo* findings. *Kappos v. Hyatt*, 132 S. Ct. at 1696 ("the district court must make its own findings *de novo* and does not act as the 'reviewing court' envisioned by the APA.").

The District Court also erred where it stated that "*Should the Court* receive new evidence on matters that were before the Board, it must make factual findings *de novo*, at least with respect to the issues on which the new evidence was taken." A6. On matters that were before the BPAI, *Kappos v. Hyatt* makes clear that the district court *must* accept the new evidence in tandem with the existing record, and has no discretion to reject it, other than as to admissibility under the rules of evidence and civil procedure. *Kappos v. Hyatt*, 132 S. Ct. at 1700-01.

The District Court also cited *Cell Genesys Inc. v. Applied Research Sys. ARS Holding, N.V.*, 499 F. Supp. 2d 59, 69 (D. Mass. 2007) (Wolf, J.), for the

proposition that § 146 allows new testimony "if equity so requires". A7. The District Court erred in stating that "[d]etermining what equity requires here is crucial." A7. While Troy seeks equity here, under *Kappos v. Hyatt* the only potential limitations exist in the rules of evidence and civil procedure, and the District Court applied no evidentiary or procedural rules in excluding the proffered testimony.

Finally, the District Court erred in stating that "[a]ny newly proffered evidence is *limited*, however, to the issues and legal theories that were raised before the Board." A9 (citing *Hyatt v. Kappos*, 625 F.3d at 1335 and *Conservolite, Inc. v. Widmayer*, 21 F.3d 1098, 1102 (Fed. Cir. 1994)) (emphasis added). That is incorrect. The Supreme Court ruled that "there are no *limitations* on a patent applicant's ability to introduce new evidence" beyond the rules of evidence and civil procedure. *Kappos v. Hyatt*, 132 S. Ct. at 1700-01 (emphasis added).

## D. District Court Erred in Refusing to Accept the Conley and Chin Evidence.

The District Court refused to accept the Conley and Chin evidence on the grounds that (1) Troy sought to introduce an issue or theory of law that it did not raise below, and (2) Troy offered "no justification for not raising the new reduction-to-practice date during the interference." A16-A17. The District Court was wrong on both points.

37

First, as Troy showed above, in the BPAI Troy offered that its invention "was reduced to practice in January - February of 2004". A704. Troy also suggested a later date relying on the Conley manufacture drawings created in July of 2004 using Troy's production model. A972. Both Troy and Samson submitted Conley drawings in the BPAI, and Samson submitted some of Conley's 2006 deposition testimony in the BPAI. A3025-A3031. Plainly, the July 2004 time frame for Troy's actual reduction to practice was not a new theory, legal or otherwise.

Nor was the Chin testimony evidence of a new legal theory on Troy's proposed date of reduction to practice. Rather, it was additional evidence of a factual dispute that Troy clearly raised in the BPAI over whether Troy reduced to practice the M.R.F. before Samson filed the Samson Provisional Application. This is precisely the type of new evidence on disputed factual issues that *Hyatt v. Kappos* and Federal Circuit decisions speak to, *i.e.*, "new evidence 'on a disputed fact question'" requiring "'such evidence [be taken] into account together with the evidence before the board'". *Kappos v. Hyatt*, 132 S. Ct. at 1700 (citing *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1038 (Fed. Cir. 1985)); *see also Agilent Techs, Inc.*, 567 F.3d at 1379-80.

Second, the Supreme Court in *Kappos v. Hyatt* rejected the argument that new evidence is admissible "only if the proponent of the evidence had no reasonable opportunity to present it to the PTO in the first instance." 132 S. Ct. at

1695.  Troy was not required to justify to the District Court why it did not introduce Chin's June 16, 2004 review of the Troy M.R.F. in the BPAI, nor did the District Court ask at the March 30 Hearing for any such justification.

### E. The District Court Erred as a Matter of Law in Concluding that the Issue of Inequitable Conduct was not Raised Before the BPAI by Troy.

The District Court erred as a matter of law in concluding that Troy did not raise Samson's inequitable conduct before the BPAI.  Ignoring *Kappos v. Hyatt*, the District Court instead reached back to the 1994 decision in *Conservolite Inc. v. Widmayer*, 21 F.3d 1098, 1102 (Fed. Cir. 1994), to restrict Troy's proffered evidence to issues and legal theories that it determined Troy raised before the BPAI.  A11-A12.

### i. The District Court Applied the Wrong Standard.

The District Court's error was two-fold.  First, *Conservolite* is not the applicable standard.  *Kappos v. Hyatt* provides that "there are no evidentiary restrictions beyond those already imposed by the Federal Rules of Evidence and the Federal Rules of Civil Procedure."  132 S. Ct. at 1700-01.  Moreover, when new evidence is introduced, "the district court must make its own findings *de novo* and does not act as the 'reviewing court' envisioned by the APA."  *Id.* at 1696.  That decision applies equally to § 146 proceedings.  *See* Argument Section 1(B), *supra*.

39

### ii.    Troy Raised the Issue of Inequitable Conduct Substantively Throughout the BPAI Proceedings.

Second, even under the *Conservolite* standard, Troy's evidence should have been admitted.  Under *Conservolite*, "[i]n order for an issue to have been raised adequately so that it qualifies for consideration in a § 146 proceeding, the issue should have been raised as specified in the PTO's interference rules, for example, through preliminary motions, motions to correct inventorship, miscellaneous motions, belated motions delayed for good cause, or opposition to these motions." *Id.*  An issue is properly raised "if the record clearly demonstrates that it was placed before the examiner-in-chief and one or more parties insisted that the issue be resolved in the interference." *Id.*

Troy concedes that it did not file a motion in the BPAI to "change benefit accorded for the contested subject matter".  37 C.F.R. §41.121(a)(1).  However, that is not the only way a party can challenge a competing claim to priority.  Troy did not in any sense waive Samson's inequitable conduct in using Troy's confidential drawings to claim that it was Samson's invention.  Troy did raise the issue of Samson's inequitable conduct as specified in the BPAI's interference rules by seeking authority to file motions on Samson's inequitable conduct.

The District Court erred in finding that "Troy has failed, however, to articulate where in the record he actually presented arguments to the Board regarding the alleged inequitable conduct of Samson."  A12.  Troy did articulate in

40

its proposed Motions List a request to file three motions relating to Samson's inequitable conduct, but it should not be penalized because the conference call with the Administrative Patent Judge on August 6, 2009 (in which Troy requested authorization to file the motions) is not recorded.

Nonetheless, through Troy's proposed three motions on Samson's inequitable conduct, and Troy's efforts to show Samson's improper use of Troy's confidential drawings in Samson's Provisional Application on the merits of both Samson and Troy's priority motions, "the record clearly demonstrates that [Troy] placed before the examiner-in-chief and [Troy] insisted that the issue be resolved in the interference." *Conservolite*, 21 F.3d at 1102.

*Conservolite* also allows introduction of the Conley testimony if "the issue has been or may be more conveniently and expeditiously raised *in another judicial proceeding*." *Conservolite*, 21 F.3d at 1102 (emphasis added). As Troy showed above, in the State Court Action, Troy introduced the Samson Provisional Application as evidence of Samson's breach of the Confidentiality Agreement and theft of Troy's trade secrets. Troy, therefore, expeditiously raised in another judicial proceeding Samson's inequitable conduct to satisfy *Conservolite*.

Accordingly, since Troy raised the issue of Samson's inequitable conduct on multiple occasions and insisted the BPAI resolve the issue, the District Court erred

in refusing to consider Troy's evidence of Samson's inequitable conduct under either *Conservolite* or the Supreme Court's *Kappos v. Hyatt* standard.

### F. Application of the Correct Standard Resolves Actual Reduction to Practice in Troy's Favor.

According to *Kappos v. Hyatt,* the District Court must have accepted additional testimony on disputed factual issues, made *de novo* findings and given no deference to the BPAI Decision. The treatment of Troy's new evidence was precisely the issue before the District Court, and *Kappos v. Hyatt* squarely ruled that Troy may present new evidence and the District Court "must make a *de novo* finding when new evidence is presented on a disputed question of fact." *Id.* at 1694.

However, in sidestepping *Kappos v. Hyatt*, the District Court acted as the reviewing court and applied the substantial basis test to affirm the BPAI decision. A14-A16 ("The Board's decision explains . . . The Board rightly determined . . . The Board also considered . . . The Board justly concluded . . . As the Board correctly determined . . .").

Accordingly, the District Court erred in giving deference to the BPAI's findings and instead should have given greater weight to the new facts not before the BPAI. All of the new evidence that Troy proffered contradicts the BPAI's findings that Troy did not prove that it conceived of the M.R.F. and that Troy did not reduce it to practice before Samson/Lankarge claimed to have reduced to practice the M.R.F.S.

42

For instance, since Samson in his post-trial motions disavowed inventing the M.R.F., he is not entitled to judgment or priority. Second, Chin corroborated that Troy's reduction to practice was no later than June 16, 2004, which is six months before the constructive reduction to practice date accorded to Samson of January 18, 2005. *See* A3938. This new evidence directly contradicts the BPAI's finding that "Troy has not demonstrated by a preponderance of the evidence an actual prior reduction to practice." A1386-A1387. The District Court should have admitted the Chin testimony and given greater weight than existing evidence in the BPAI, *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. at 2251. Third, Conley's drawings, already in the BPAI[24], and deposition testimony (some of which Samson introduced in the BPAI[25]) also corroborate that Troy reduced to practice its M.R.F. no later than July of 2004. However, both the BPAI and the District Court erred in refusing address this evidence.

### 3.     The District Court Erred as a Matter of Law in Concluding that Troy Failed to Demonstrate Prior Conception of the M.R.F.

Troy showed each of the five elements of the M.R.F. as of December 2003/January 2004 through an accumulation of the evidence. However, the District Court erroneously required Troy to prove prior conception through a single

---

[24] *See* A1789-A1797, A1818-A1819, A1821-A1825, A5502-A5508

[25] *See* A3025-A3031.

piece of evidence containing all five elements of the M.R.F. This fundamental error underlies its flawed derivation and inurement analyses and its mistaken conclusion that Troy did not prove prior conception.

> **A.** **The Beaudet Drawings Corroborated the Upper Portion, the Lower Portion, Lug Rails and the Clamping Assembly as of June or July, 2003.**

As we show below, David Beaudet corroborated the first four elements of Troy's concept as of June or July 2003:

1. **"an upper portion … configured to engage a top portion of the barrel nut …"**

2. **"a lower portion … having a top section … and lower side sections …"**

3. **"a clamping assembly … for engaging a bottom portion of the barrel nut …"**

4. **"lug rails … project from the inner surface of upper portion at opposing sides and proximate edges thereof, the lug rails extend longitudinally from the proximate forward end to a position proximate the rearward end and include a plurality of gaps[.]"**

In early 2003, Mr. Beaudet made drawings of the handguard for Troy. A4061-A4081. In deposition testimony in the State Court Action introduced in the BPAI, Beaudet stated Troy gave him the parameters for the design:

> [Troy] referenced that there was a solicitation for a free floating hand guard. So it had to clamp on, without removing any pieces from the existing rifle. So, as I recall, you pulled back the delta ring, and then it clamped onto the piece that was below that using – when you tightened the two screws, I believe it wedged against a nut that looked like a sprocket, and then the delta ring slid back on top of that.

A3569.  Beaudet further corroborated that in June or July 2003, he met with Troy

to finalize Troy's design.  A3568, A3574-A3576, A4061, A4072-A4077.  Beaudet

testified that in Troy's presence, he prepared for Troy solid model images of

Troy's design on his computer.  A3573, A4071.[26]  Troy paid Beaudet for his

services.  A3989.  These images corroborate four elements of Troy's invention: (1)

the upper rail, (2) the lower lug rail, (3) a two piece clamping assembly around the

factory barrel nut of the weapon, and (4) interrupted lug rails.  A3988-A3989; *see

also* A3336-A3340.[27]

The District Court found the Beaudet drawings insufficient on the ground

that they did not include the "detent assembly, lug rails on the upper portion and

---

[26] Troy introduced these drawings in the BPAI proceedings as Troy Exhibits 2001 and 2002 to its Priority Statement. *See* A705, A4109-A4112; *see also* A3336-A3340.

[27] Troy also offered the Affidavit of Larry Himmel of Leed Himmel to corroborate that Troy conceived of the handguard design no later than January 10, 2004. A3904-A3934.  Troy engaged Leed Himmel to prepare extrusion drawings, and extrusions, for the handguard.  A3904.  The drawings are dated January 10, 2004 and bear Troy's name in some title blocks.  A3907-A3934.  These drawings were prepared for Troy alone and for the exclusive benefit of Troy.  A3905.  Although Troy maintains that the first four elements of the M.R.F. were conceived no later than June or July of 2003, the Leed Himmel drawings, coupled with Chudzik's corroboration of the detent element, demonstrate Troy prior conception of the entire M.R.F. no later than January 2004.

lugs spaced apart extending from each end of the lower portion."[28]  A20.

However, Troy explained to the jury in the State Court Action that the Beaudet

drawings *did* show the lug rails.  A4091 ("On this drawing that you see on the

screen, the lower lug rail is lugged in the exact way that it is on the MRF.  Here, it

goes on, interrupted, slides in and locks.  So, the main pieces are the lower rail, the

upper rail and the clamp.  This is the first version of my MRF handguard.").

Accordingly, the Beaudet drawings proved prior conception of the first four

elements of the M.R.F., and the District Court erred in failing to consider that

proof with additional evidence of prior conception of the detent assembly to show

prior conception of the entire M.R.F.

### B.    Troy's Emails to Samson and Anthony Lawrence Further Corroborated Troy's Conception of the Clamping Assembly on July 2, 2003.

Troy also showed prior conception of the clamping assembly.  On July 2,

2003, Troy sent a detailed description of his clamping assembly to Samson by E-

mail.  A3991, A4106-A4107.  At the top of the email, Troy informed Samson that

---

[28] In doing so, the District Court adopted as its own the BPAI's criticisms and conclusions.  A1379-A1380 ("Even if we accept that those features are shown in Exhibits 2001 and 2002, Troy has not accounted for many other features of the count.  For example, Count 1 requires a detent assembly carried by the clamp assembly, lug rails on an upper portion of the hand grip with a plurality of gaps, and spaced apart lugs extending from each edge of a lower portion of the hand grip.  Troy does not sufficiently demonstrate how the Exhibits 2001 and 2002 show these elements of the count.").

this information was "Proprietary to Troy Industries, Inc." *Id.* Troy then described to Samson how he wanted to remove the delta ring in order to *attach* his handguard to the weapon:

> I think we should start with a run of an easier design which would completely replace *the delta ring assembly (the part you pull back to get the handguards off. We could use 4 screws with Belleville washers instead of two and we would not need the steel wings as the handguard (top portion/main body) would drop on and we would only need to collar the underside* . . . The front end of the handguard would be the same. The whole assembly would be incredibly light weight and strong as hell with the whole surface of the barrel nut used for stability.

A4106. In his email Troy identified its clamping assembly as "my idea on the handguard". *Id.* On July 4, 2003, Troy sent Samson another E-mail stating, "I have come up with a genius design for *attaching* the rails that will not require inserts. [sic] and we will make the lower handguard out of aluminum as well." A4108 (emphasis added).[29]

Troy forwarded the above E-mail exchange with Samson to Anthony Lawrence. Mr. Lawrence responded on July 2, 2003, asking "[c]an we do it without removing the Delta ring?" A3902. Lawrence testified that Troy responded the same day as follows:

---

[29] Between April and November 2003, Troy prepared and developed more drawings. These drawings were submitted to the BPAI as Troy Exhibits 2008, 2025 and 2026. A3342-A3343, A3580, A3582.

47

> We can however it will double the cost to manufacture on the initial run and at this point I need to get something to market ASAP. The design as I described it to [Samson] will be the strongest AR system available.

A3902-A3903.

The District Court appears to have conceded Troy's evidence showed conception of the clamping assembly by July 2003. A20 ("This evidence supplements Troy's previous showing of a clamp assembly for the June 2003 conception ...."). However, again, the District Court erred in considering this evidence in a vacuum and deemed it insufficient for proving prior conception because it did not show the remaining elements (the clamp assembly "does not account for the remaining elements of Claim 3."). *Id.* The District Court, therefore, erroneously concluded that Troy failed to show prior conception of the clamping assembly. A20.

> ### C. The Affidavit of John Chudzik Corroborates Troy's December 2003/January 2004 Design of the Detent, the <u>Final Element of Troy's M.R.F.</u>

Chudzik corroborated that Troy conceived of the fifth and final element of the M.R.F. no later than December 2003/January 2004:

> ### 5. "a detent assembly ... carried by the clamp assembly ... for engaging the lower portion"

In his affidavit, Chudzik testified that Troy designed the clamping mechanism and a square detent mechanism by December 2003/January 2004:

48

> Mr. Troy had also conceived of a two piece clamp design to clamp his handguard to the barrel nut of the weapon. In order to secure the attachment of the two piece clamp design, Mr. *Troy proposed a spring loaded detent system to lock the lower handguard onto the clamp* ... Troy conceived of the spring detent system over the period of December of 2003 and January of 2004. He and I discussed the spring detent idea and design during that same time.

A3936-A3937 (emphasis added).

The District Court appears to have conceded that Chudzik's affidavit adequately supplemented the BPAI record and demonstrated Troy's prior conception of the final element, the detent. A22 ("Troy proffered the affidavit of John Chudzik . . . to corroborate Troy's testimony that he conceived of a spring detent assembly concept in January 2004."). However, again, the District Court looked at this evidence in a vacuum, and erred in ruling it insufficient to show prior conception on the ground that the Chudzik affidavit did not show "lug rails on the upper portion and spaced apart lugs extending from each end of the lower portion of the handguard." A22.

Thus, the BPAI record, in tandem with the supplemented testimony and evidence, shows that Troy had conceived of all five elements of the Count, and disclosed to others, including Samson, by means of drawings, discussion, and written communication in April of 2003, in July of 2003, and from November 2003 – January 2004. Accordingly, since Troy was in possession of all the elements of

49

the Count prior to Samson's alleged February 7, 2004 conception date, the District Court erred in finding that Troy was not entitled to judgment of priority.

**4. The District Court Erred as a Matter of Law in Concluding That Troy Failed to Demonstrate that Samson Derived the M.R.F. From Troy.**

Since Troy adequately demonstrated prior conception, the District Court should have considered Troy's derivation argument. A party may prove that another "did not invent the patented invention by showing derivation." *Brand v. Miller*, 487 F.3d 862, 869 (Fed. Cir. 2007). Proof of derivation requires (1) prior conception of the claimed subject matter, and (2) communication of that conception "that is sufficient to enable [him] to construct and successfully operate the invention." *Id.* (quoting *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1367 (Fed. Cir. 2004)).

**A. Collateral Estoppel Precluded the District Court From Finding Samson Did Not Derive Its Claimed Invention From Troy.**

The State Court Action fully and fairly decided the following facts central to the two elements of derivation under *Brand*:

- Troy Industries, Inc. entered into a Confidentiality Agreement with Samson Manufacturing. (Jury Verdict, ¶1)

- The Agreement covered all confidential business information from Troy Industries, Inc. to Samson. (*Id*. at ¶2)

- Troy Industries, Inc. provided trade secrets or confidential business information to Samson after entering the Agreement. (*Id*. at ¶3)

50

- Samson used trade secrets or confidential business information that he learned from Troy Industries, Inc. after entering into the Agreement. (*Id*. at ¶4)

- The information used by Samson was still "secret" at the time used by Samson. (*Id*. at ¶5)

- Samson breached the Agreement by using the trade secrets or confidential business information covered by the Agreement to manufacture the M.R.F. (*Id*. at ¶6)

A288-A292, A4003. Troy introduced the jury verdict in the BPAI proceeding as Troy Exhibit 2062. A3679-A3683.

In its March 21, 2012, affirmance of the trial court judgment, the Massachusetts Appeals Court rejecting Samson's argument that the Confidentiality Agreement was not specific enough:

> Samson argues that the confidentiality agreement did not create trade secret protection because it does not specify what is confidential, and that Troy "never spelled out that the MRF was confidential."
>
> . . .
>
> We conclude there was ample evidence to support the jury's principal findings: that Troy provided trade secrets or confidential business information to Samson after entering into a confidentiality agreement; that Samson used the trade secrets and confidential business information; and that *Samson breached the agreement by using the secrets and information to manufacture the MRFS*.

*Troy Indus., Inc. v. Samson Mfg. Corp.*, 81 Mass. App. Ct. 1122, *1-*2 (Mar. 21, 2012) (emphasis added).

The Appeals Court issued its decision nine days before the March 30 Hearing. At the March 30 Hearing, the District Court recognized Samson's breach of the Confidentiality Agreement as having been "established by a jury and a judgment." *See* A4462-A4464, A4482-A4484.[30] However, in direct contradiction to those already established facts, the District Court in its decision embraced the very argument that the jury and Appeals Court rejected, without even acknowledging the existence of the jury verdict and Appeals Court affirmance. The District Court adopted almost verbatim the decision of the BPAI, stating "[t]he confidentiality agreement does not describe the specific work performed by Samson on behalf of Troy . . ."[31] A19.

Under the law of the First Circuit, the District Court was precluded from finding that Samson did not derive the claimed invention from Troy. "Application of the principles of collateral estoppel is not a matter within our jurisdiction; thus, we apply the law of the circuit in which the district court sits". *Reese v. Verizon California, Inc.*, 498 Fed. Appx. 980, 982 (Fed. Cir. 2012). In the First Circuit, a

---

[30] The District Court stated that "Samson Manufacturing violated a confidentiality agreement. I haven't heard anything to the contrary of that. That's been established by a jury and a judgment. And that preceded the Board proceedings. So that much is established." A4483.

[31] The BPAI said that "the confidentiality agreement (Ex. 2005) is not specific ... The agreement does not set forth the specific work to be performed by Mr. Samson ...." A1385.

party may assert collateral estoppel where: (1) the issues raised in the two actions are the same; (2) the issue was actually litigated in the earlier action; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was necessary to that judgment. *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 592 (1st Cir. 2012).

This jury verdict and Appeals Court affirmance demonstrate that (1) both the issues of prior conception and communication were raised in the State Court Action; (2) both issues were actually litigated; (3) both issues were determined by a valid and binding final judgment; and (4) both issues were necessary to the jury's finding that Samson breached the Confidentiality Agreement and misappropriated Troy's trade secrets to create its claimed invention, the M.F.R.S. The only forum that actually litigated the Confidentiality Agreement was the State Court Action. Neither the BPAI nor the District Court heard any testimony on the Confidentiality Agreement whatsoever.

Consequently, Samson was precluded from arguing that its claimed invention was not derived from Troy's invention because the jury already adjudicated the issues underlying derivation: (1) prior conception and (2) communication. As the District Court noted at the March 30 Hearing, Samson was, therefore, precluded from re-litigating these issues which were already decided against it. A4483-A4484; *see also Blonder-Tongue Laboratories, Inc. v.*

53

*Univ. of Illinois Foundation*, 402 U.S. 313 (1971). However, this also meant that the District Court was precluded from making findings contradictory to the jury verdict and Appeals Court affirmance in the State Court Action. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980) (citing 28 U.S.C. § 1738) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments"). Accordingly, the District Court's conclusions regarding derivation were made in error.

**B.     The Evidence Before the District Court Proved Samson Derived Its Claimed Invention From Troy.**

Even if collateral estoppel did not apply, the record before the District Court demonstrates Troy's prior conception and communication to Samson of the M.R.F. to support a finding of derivation under *Brand*. As shown in Argument Section 2, *supra*, Troy demonstrated prior conception. Troy provided the identical evidence of communication to the District Court that Troy introduced to the jury.

**5.     The District Court Erred as a Matter of Law in Concluding That Troy Failed to Demonstrate That Samson's Reduction to Practice of the Subject Invention Inured to the Benefit of Troy.**

As the District Court noted, to show inurement Troy must prove (1) that it conceived of the invention; (2) it had an expectation that the embodiment tested would work for the intended purpose of the invention; and (3) it submitted the embodiment for testing for the intended purpose of the invention. *See Genentech, Inc. v. Chiron Corp.*, 220 F.3d 1345, 1354 (Fed. Cir. 2000).

Troy has shown above that the supplemented record showed that Troy was entitled to a judgment from the District Court that Troy conceived of the M.R.F. Troy has also shown that the District Court should have, but did not, find that the State Court Action precluded any finding contrary to the established finding in that Samson breached the Confidentiality Agreement in creating its M.R.F.S.  *See* Argument Section 3(A), *supra*.  Both Troy and Samson agree that all elements of the M.R.F. were conceived and disclosed to others "a definite and permanent idea of the complete and operative" M.R.F. in sufficiently clear terms that enabled Samson to machine the prototypes of the M.R.F. for the February 2004 SHOT Show.  *Slip Track Systems, Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1262-63 (Fed. Cir. 2002).  Accordingly, the District Court erred in finding Troy failed to prove inurement.

**6.    The District Court Decision Should be Voided as Having Been Entered During Samson's Bankruptcy.**

Even if the Court were not to reverse the judgment in favor of Troy, it should void the District Court Decision as having been entered during the automatic stay period, and remand the case for reconsideration under *Kappos v. Hyatt*.  Any "judicial action taken in contravention of the automatic stay" is void. *In re Bright*, 338 B.R. 530, 535 (B.A.P. 1st Cir. 2006).  The District Court Decision constitutes judicial action taken in contravention of the automatic stay. On March 25, 2013, Samson filed a voluntary petition for relief under Chapter 11

of the Bankruptcy Code (the "Bankruptcy Proceeding"). A4649-A4650. On April 30, 2013, during the pendency of the Bankruptcy Proceeding, the District Court entered the District Court Decision at issue here. A1-A24. Though Samson did not file a Notice of Bankruptcy with the District Court, the § 146 Action was automatically stayed under 11 U.S.C. § 362(a)(1). *In re Soares*, 107 F.3d 969, 976 (1st Cir. 1997).

The District Court denied a motion for reconsideration that Troy filed on May 28, 2013, seeking the District Court to void its Decision since it was entered during the automatic stay.[32] On May 30, 2013, Troy filed its initial notice of appeal. A5195-A5196. On June 11, 2013, the District Court entered an Electronic Order stating, "Since an appeal has been taken in this case, this Court lacks jurisdiction to act on the pending motions other than in aid of the appeal. In aid of the appeal, therefore, this Court indicates that no notice or suggestion of bankruptcy was ever filed. If this Court had jurisdiction, it would deny the motion for reconsideration on the merits and deny the motion to amend as untimely." A25-A26.

---

[32] Troy was not allowed to file anything in the § 146 Action during the pendency of Samson's bankruptcy. The Bankruptcy Court dismissed Samson's bankruptcy petition on May 17, 2013, allowing Troy to file its Motion for Reconsideration. A4690-A4681. Troy filed its Motion for Reconsideration within two weeks of the dismissal.

However, though the District Court thought that it had no authority to act on Troy's Motion for Reconsideration, A4621-A5091, its Decision was entered during the automatic stay period and must, therefore, be voided. *In re Soares*, 107 F.3d at 976.

### 7. The USPTO's Issuance of a Patent to Samson Should be Voided Since it Was Issued by Mistake.

In its Motion for Reconsideration, Troy also requested that the District Court void the issuance of Patent No. 8,276,304 (the "'304 Patent"), since the USPTO issued it on the mistaken belief that a stipulation of dismissal involving a separate party favorably resolved the § 146 action in favor of Samson.

In Count II of its Complaint, Troy had claimed that a separate patent owned by co-defendant A.R.M.S. interfered with the '451 Patent. A63. On July 3, 2012, Troy and A.R.M.S. had filed a Joint Stipulation of Dismissal with Prejudice (the "A.R.M.S. Stipulation"), in which they dismissed all claims, affirmative defenses and counterclaims asserted against each other. A4618-A4619. This stipulation did not affect Count I of this action but was attached to the patent examiner's Detailed Action. A4658-A4660.

On April 22, 2013, through Samson's bankruptcy, Troy learned that the USPTO issued to Samson the '304 Patent on October 3, 2012. A4652-A4662, A5170-A5182.

Upon investigating the issuance, the file history of the Samson '665 Application disclosed that under the mistaken belief that the § 146 action was resolved between Troy and Samson, on August 22, 2012, a patent examiner at the USPTO issued a Notice of Allowance of the Samson '665 Application. A5477-A5489. The patent examiner issued a Detailed Action, stating that "[i]n light of Civil Action 1:11-cv-10384-WGY, attached, *ex parte* prosecution is resumed." A4658-A4660.

The pendency of this § 146 Action in District Court precluded the BPAI from acting on Samson's interference proceeding, and the USPTO had no authorization to continue examination of the '665 Application. *See* 35 U.S.C. § 146; *see also* MPEP § 2307 ("The Board retains jurisdiction over the interference until the interference is terminated. The Director has defined termination to occur ... after completion of judicial review including any further action by the Board."). Consequently, the USPTO issued the '304 Patent in error. *Martin v. Clevenger*, 11 U.S.P.Q.2d 1399, at *1 (Comm'r 1989) ("However, as made clear in [the MPEP], the 'normal' practice is not to issue a patent when judicial review is sought under 35 U.S.C. § 146.").

Since judicial review of the BPAI's decision continues, the USPTO has no authorization to issue the '304 Patent. Accordingly, the USPTO's issuance of the '304 Patent should be voided.

58

## 8.    If the Issuance of the '304 Patent is Not Voided, Troy's Motion to Amend Complaint Should Be Allowed.

In light of the USPTO's issuance of the '304 Patent, on May 30, 2013, Troy filed a Motion to Amend Complaint, seeking to add a count for an interference pursuant to 35 U.S.C. § 291 and to correct inventorship under 35 U.S.C. § 256, based upon the recently issued '304 Patent.  A5092-A5194.

The District Court characterized Troy's Motion to Amend Complaint as "untimely".  A26-A26.  However, the causes of action Troy sought to add required the existence of an issued patent and, therefore, did not arise until the USPTO issued the '304 Patent.  *See* 35 U.S.C. §§ 256, 291; *see also HIP Bio, Inc. v. Yung Shin. Pharms. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010) (cause of action to challenge inventorship arises once the patent issues).  Troy filed its motion shortly (1) after it learned that the USPTO issued the '304 Patent; (2) after an investigation of how and why the USPTO issued the '304 Patent; and (3) after the Bankruptcy Court dismissed the Bankruptcy Petition, thus allowing Troy to file the motion. Accordingly, Troy's Motion to Amend Complaint was timely.  Should this Court not reverse the judgment and not void the '304 Patent, on remand it should instruct the District Court to allow Troy to amend its Complaint.

## Conclusion and Relief Sought

For the foregoing reasons, Troy requests that this Court reverse the District Court's affirmance of the cancellation of claims 1-13 of the '451 Patent, since Troy

59

first conceived of and/or reduced to practice the M.R.F, and that Samson's work towards its claimed invention was derived from Troy and inured to the benefit of Troy. Troy also seeks an order voiding the District Court Decision on the ground that the District Court entered the Decision during the Samson Bankruptcy in violation of the automatic stay.

In the alternative, Troy requests that this Court enter a decision remanding the matter to the District Court with instructions to grant Troy a trial on the merits, to allow Troy to introduce its additional testimony, to make *de novo* findings, and to allow Troy to amend its Complaint to add a count for an interference pursuant to 35 U.S.C. § 291 and to correct inventorship under 35 U.S.C. § 256, based upon the erroneously issued Patent No. 8,276,304.

In any event, Troy requests a decision remanding the matter to the District Court with instructions to void the USPTO's issuance of Patent No. 8,276,304.

Respectfully submitted,

STEPHEN P. TROY, JR.,

By his attorney,

Dated: November 14, 2013        */s/ Damian R. LaPlaca*
        Damian R. LaPlaca, Esq.
        NELSON KINDER + MOSSEAU PC
        Two Oliver Street
        Boston, MA 02109
        Tel: (617) 778-7500
        Fax: (617) 778-7501
        Email: dlaplaca@nkmlawyers.com

PARTICIPANTS ONLY

# ADDENDUM

# ADDENDUM

## <u>TABLE OF CONTENTS</u>

| Document Description | Pages |
|---|---|
| Memorandum and Order, April 30, 2013 (Docket No. 67) | A1-24 |
| Electronic Order, June 11, 2013 (Docket No. 80) | A25-26 |
| Final Judgment, July 15, 2013 (Docket No. 87) | A27-28 |
| U.S. Patent No. 7,216,451 | A44-53 |
| Decision of the Board in *Troy v Samson*, Interference No. 105,698, January 6, 2011 (Paper No. 203) | A1362-1389 |
| Judgment of the Board in *Troy v Samson*, Interference No. 105,698, January 6, 2011 (Paper No. 203) | A1391-1393 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
STEPHEN P. TROY, JR.,         )
                              )
                Plaintiff,    )
                              )
        v.                    )      CIVIL ACTION
                              )      NO. 11-10384-WGY
SAMSON MANUFACTURING CORPORATION )
                              )
                Defendant.    )
                              )
```

MEMORANDUM & ORDER

YOUNG, D.J.                                    April 30, 2013

I.   **INTRODUCTION**

The plaintiff, Stephen P. Troy, Jr. ("Troy"), brings this
action pursuant to 35 U.S.C. section 146 ("Section 146"), seeking
judicial review of a final decision and order (the "Decision") of
the Board of Patent Appeals and Interferences (the "Board") of
the United States Patent and Trademark Office (the "PTO") in
Patent Interference No. 105,698.  The interference proceeding
before the Board involved a dispute over priority between U.S.
Patent No. 7,216,451 (the "'451 Patent") and U.S. Patent
Application No. 11/326,665 (the "'665 Application").  The
interfering subject matter under the '451 Patent and the '665
Application related to a modular handguard rail for a firearm.
The Board held that Troy failed to establish the priority of the
'451 Patent over the '665 Application.  Under Count I of the

1

A1

complaint, Troy requests that this Court review the Board's
decision as to the priority of invention.

**A.  Background**

**1.  The Invention**

Troy alleges that, in January 2003, he began designing and
developing a firearm component, named the Modular Rail Forend
(the "Troy Rail"), to be retrofitted to the M16 rifle and
carbine.  Compl. ¶ 10, ECF No. 1.  The Troy Rail is designed to
be "free-floating," meaning that it does not touch the barrel of
the firearm.  Id. (internal quotation marks omitted).  This is
accomplished by affixing the rail to the barrel nut of the
firearm via a clamp that screws into the upper piece and by
attaching the handguard to the barrel nut.  Id.

Troy is the inventor and owner of the '451 Patent, which was
issued on May 15, 2007.  R. Patent Interference No. 105,698 (SCM)
("Interference R.") 3350.[1]  Scott W. Samson ("Samson") filed the
'665 Application on January 6, 2006.[2]  See id. at 884.  The Board

---

[1] Notice of the manual filing of the interference record was
provided on February 15, 2012.  Partially Assented-To Mot. Def.
Samson Mfg. Corp. Admit Interference R. Patent Interference No.
105,698, Ex. B, R. Patent Interference No. 105,698 (SCM), ECF No.
35-2.  The interference record features somewhat unusual
pagination.  (For example, page 1 of the interference record
carries the label "IR000001.").  In the interest of simplicity
and clarity, references to the interference record will omit the
"IR" designation and any extraneous numerals.

[2] Samson Manufacturing Corporation ("Samson Manufacturing"),
the assignee of the '665 Application, is the real party in
interest.  Id. at 98.  For the purposes of this memorandum,

A2

determined that Claim 3 of the '451 Patent and Claim 6 of the
'665 Application are directed to the same subject matter.  <u>Id.</u> at
881.  Claim 3 states that the modular hand grip under the '451
Patent is comprised of:

>    [A]n upper portion having a forward end, a
> rearward end, an inner surface and an outer surface,
> the rearward end is configured to engage a top portion
> of a barrel nut;
>
>    lug rails project from the inner surface of upper
> portion at opposing sides and proximate edges thereof,
> the lug rails extend longitudinally from proximate the
> forward end to a position proximate the rearward end
> and include a plurality of gaps formed therein;
>
>    a clamp assembly for engaging a bottom portion of
> the barrel nut is attached to the rearward end of the
> upper portion;
>
>    a lower portion having a top section and opposing
> side sections extending therefrom and each terminating
> at an edge, a plurality of spaced apart lugs extending
> from each edge and receivable in the gaps in the lug
> rails of the upper portion and translatable in one of a
> forward direction and a rearward direction positioning
> the lugs under the lug rails; and
>
>    a detent assembly carried by the clamp assembly
> for engaging the lower portion.

<u>Id.</u> at 3357-58; <u>see also</u> <u>id.</u> at 3352 fig.4 (providing an
illustration of the modular hand grip from an exploded
perspective).

   **2.   Proceedings Before the Board**

   Troy initiated interference proceedings against Samson and

_____

however, all discussion concerning Samson Manufacturing will be
made with reference to Samson himself.

3

Kenneth Lankarge by filing a motion with the Board asserting priority of invention. Id. at 880-81. Troy was declared the "junior party" in the interference because he filed a provisional patent application for the '451 Patent on February 10, 2006, thirty-five days after the date on which the '665 Application had been filed. See id. at 883-84. After accounting for the filings of earlier applications by both parties, the Board deemed Troy's earliest constructive reduction-to-practice date to be February 11, 2005, and Samson's earliest constructive reduction-to-practice date to be January 18, 2005 (the "Critical Date"). Id. at 884; see also id. at 885. As the junior party, Troy was required to demonstrate priority of invention by a preponderance of the evidence. Id. at 885; see 37 C.F.R § 41.207(a)(2).

The Board issued a decision on Troy's motion on January 6, 2011. Interference R. at 880. In order to establish priority, Troy carried the burden of showing an actual reduction to practice of an embodiment of the invention prior to the Critical Date. See id. at 885. The Board determined that Troy failed to demonstrate by a preponderance of the evidence an actual reduction to practice of every element of Claim 3 prior to the Critical Date. See id. at 885-93.

Since an actual reduction to practice had not been established, Troy had to show that he earlier conceived of the invention in order to prove inurement or derivation. Id. at 894.

4

A4

Troy sought to demonstrate that he conceived of the invention on
any of five separate occasions: April 2003, June 2003, July 2003,
November 2003, and January 2004.  See id. at 894-902.  The Board
concluded that the evidence, taken either individually for the
various alleged dates of conception or collectively, did not
account for all the elements of Claim 3.  Id. at 902.
Consequently, the Board determined that "Troy ha[d] not
sufficiently demonstrated by a preponderance of the evidence a
prior conception of the [invention]."  Id.

The Board next turned to the question of whether Samson's
actions could properly be said to have inured to Troy's benefit.
See id. at 902-04.  Troy alleged that he communicated his
conception to Samson, that Samson had signed a confidentiality
agreement, and that all actions taken by Samson between April 9,
2003, and February 2004 relating to the subject matter of Claim 3
inured to the benefit of Troy.  Id. at 902-03.  The Board,
however, disagreed, determining that Troy had not sufficiently
demonstrated that Samson had performed any act of inurement.  Id.
at 904.

Finally, the Board briefly entertained Troy's derivation
argument but ultimately found that Troy's failure to establish
conception of the invention prevented him from establishing that
Samson derived the subject matter of Claim 3.  Id.

**II.  ANALYSIS**

5

A5

**A.   Standard of Review and Admission of Further Evidence**

A party that is dissatisfied with a decision of the Board may commence a civil action in district court.  35 U.S.C. § 146. On motion of either party, the record from the Board proceedings may be admitted into evidence "without prejudice to the right of the parties to take further testimony."  Id.  This renders the district court proceeding in a Section 146 action a strange "hybrid of an appeal and a trial de novo."  AlphaVax, Inc. v. Novartis Vaccines & Diagnostics, Inc., 719 F. Supp. 2d 156, 162 (D. Mass. 2010) (quoting Winner Int'l Royalty Corp. v. Wang, 202 F.3d 1340, 1345 (Fed. Cir. 2000)) (internal quotation mark omitted).  The Court must review the Board's conclusions of law de novo, but the underlying factual determinations are reviewed for clear error.  Abbott GmbH & Co. KG v. Yeda Research & Dev., Co., 576 F. Supp. 2d 44, 49 (D.D.C. 2008) (citing Winner, 202 F.3d at 1348).  Should the Court receive new evidence on matters that were before the Board, it must make factual findings de novo, at least with respect to the issues on which the new evidence is taken.  See Conservolite, Inc. v. Widmayer, 21 F.3d 1098, 1102 (Fed. Cir. 1994).  If neither party introduces new evidence, however, then the Court must review the Board's factual findings under the familiar substantial evidence test for administrative proceedings.  See Mazzari v. Rogan, 323 F.3d 1000, 1005 (Fed. Cir. 2003).

6

A6

Troy seeks to introduce six affidavits as new evidence in order to shore up evidentiary gaps in the record of the Board proceeding.  Samson argues that the Court ought not consider the newly proffered evidence because it was both known and available to Troy at the time of the Board proceeding.  Trial Br. Def. Samson Mfg. Corp. 4, ECF No. 51.  Troy contends, however, that this Court is required to admit the newly proffered evidence pursuant to Section 146.  Mem. Law Stephen P. Troy, Jr. Supp. Count I ("Troy's Mem.") 3, ECF No. 50.  Although Section 146 allows the Court to admit new evidence from witnesses who had not formerly been before the Board "if equity so requires," Cell Genesys, Inc. v. Applied Research Sys. ARS Holding, N.V., 499 F. Supp. 2d 59, 69 (D. Mass. 2007) (Wolf, J.) (citing Conservolite, 21 F.3d at 1102), the statute does not prescribe when it is appropriate to do so.  Determining what equity requires here is crucial.

In consonance with Federal Circuit precedent, this Court, as well as other judges in this district, have previously stated that a Section 146 action does not guarantee the admission of new evidence and live testimony.  See, e.g., AlphaVax, 719 F. Supp. 2d at 163 (holding that the plaintiff "ought not be allowed a chance to 'do over' what it has chosen not to do before the Board"); Invitrogen Corp. v. President & Fellows of Harvard Coll., 578 F. Supp. 2d 248, 255 (D. Mass. 2008) (Gorton, J.)

7

A7

(noting that the plaintiff would not be afforded the opportunity to supplement the record with evidence available but not adequately presented to the Board); <u>Cell Genesys</u>, 499 F. Supp. 2d at 74-76 (stating that the court ought admit new evidence only to enhance the accuracy of credibility determinations or to present evidence that was unavailable at the time of the Board's proceedings).

Recently, however, the Federal Circuit has treated the admission of new evidence in a Section 146 proceeding more generously.  See <u>Streck, Inc.</u> v. <u>Research & Diagnostic Sys., Inc.</u>, 659 F.3d 1186, 1190 (Fed. Cir. 2011) (noting that "[n]either statute nor precedent" requires newly proffered evidence to conflict with the record before the Board in order to be admissible).  Furthermore, in a still more recent decision, the Supreme Court affirmed "that Congress intended that applicants would be free to introduce new evidence in § 145 proceedings subject only to . . . the Federal Rules of Evidence and the Federal Rules of Civil Procedure, even if the applicant had no justification for failing to present the evidence to the PTO."[3] <u>Kappos</u> v. <u>Hyatt</u>, 132 S. Ct. 1690, 1695 (2012) (quoting <u>Hyatt</u> v. <u>Kappos</u>, 625 F.3d 1320, 1331 (Fed. Cir. 2010) (en banc),

---

[3] The Federal Circuit has recognized that 35 U.S.C. sections 145 and 146 are cognate provisions "that are to be treated similarly." <u>Streck</u>, 659 F.3d at 1190 n.2 (quoting <u>Hyatt</u>, 625 F.3d at 1330 n.2).

A8

<u>aff'd</u>, 132 S. Ct. 1690) (internal quotation marks omitted); <u>see also</u> <u>id.</u> at 1700-01. Any newly proffered evidence is limited, however, to the issues and legal theories that were raised before the Board. <u>Hyatt</u>, 625 F.3d at 1335 (citing <u>Conservolite</u>, 21 F.3d at 1102) (noting that the Federal Circuit's ruling in <u>Hyatt</u> does not disturb its earlier principle that "issues (and evidence relating to new issues) that were not raised in the Patent Office proceedings generally may not be raised in a § 145 proceeding").

Accordingly, the Court must consider Troy's newly proffered evidence, as its availability vel non at the time of the Board proceedings does not preclude its admission.[4] The Court will not, however, consider any evidence related to issues not raised before the Board.[5]

### B.   Priority of Invention

Priority of invention is granted "to the first party to reduce an invention to practice unless the other party can show

---

[4] Board proceedings are thus reduced to "trial runs," which a dissatisfied party may "do over" in district court. While this makes little practical sense and flies in the face of the usual tenets of administrative and civil procedure -- which uniformly seek to narrow the issues for resolution -- I am but a district judge, and "Theirs not to reason why, / Theirs but to do and die." Alfred, Lord Tennyson, <u>The Charge of the Light Brigade</u> (1854), <u>in</u> <u>The Complete Poetical Works of Tennyson</u> 226, 226 (W. J. Rolfe ed., Cambridge, Houghton, Mifflin & Co. 1898).

[5] For a full discussion of the jurisprudential underpinnings of this rule, see Tory A. Weigand, <u>Raise or Lose: Appellate Discretion and Principled Decision-Making</u>, 17 Suffolk J. Trial & App. Advoc. 179 (2012).

that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1169 (Fed. Cir. 2006) (quoting Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998)) (internal quotation mark omitted); see also 35 U.S.C. § 102(g)(2). The determination of priority is matter of law based on subsidiary factual findings. Price v. Symsek, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

### 1.   Burden of Proof

The Board deemed Troy the junior party in the interference proceeding because Troy's provisional patent application was filed later than Samson's provisional patent application.[6] See Interference R. at 883-84. The effective filing date of a provisional patent application serves both as "conception and constructive reduction to practice of the subject matter described in the application." Hyatt v. Boone, 146 F.3d 1348, 1352 (Fed. Cir. 1998) (citing Yasuko Kawai v. Metlesics, 480 F.2d 880, 885 (C.C.P.A. 1973)). Having filed the first provisional patent application, Samson could rely on the content of the application without providing evidence of conception or an actual reduction to practice. Conversely, Troy bore the burden of

---

[6] Samson filed a provisional patent application (Prov. App. No. 60/644,890) on January 18, 2005, and Troy filed his provisional patent application (Prov. App. No. 60/652,035) on February 11, 2005. Compl. ¶¶ 22-23.

A10

proving priority of invention by a preponderance of the evidence.
See Brown v. Barbacid, 276 F.3d 1327, 1331-32 (Fed. Cir. 2002).

Troy argues that the Board misplaced the burden of proof and
that Samson should have been deemed the junior party in the
interference proceeding.  Troy's Mem. 6.  Troy claims that the
'665 Application was filed using only confidential proprietary
drawings and images of the invention belonging to Troy.  Id. at
6-7.  Troy further argues that Samson should have been denied
senior party status as a result of its inequitable conduct.  See
id. at 7.

Samson claims that Troy has waived his right to raise this
issue before the Court, arguing that Troy was required to
challenge the Board's determination of priority by filing a
substantive motion in the interference proceeding but failed to
do so.  Resp. Def. Samson Mfg. Corp. Pl.'s Supplemental Mem. 6,
ECF No. 55.  The regulations governing interference proceedings
before the Board provide the mechanism for challenging priority
determinations, listing the grounds upon which a substantive
motion may be filed.  See 37 C.F.R. § 41.121(a)(1).  Furthermore,
a party to an interference generally may not raise issues in a
Section 146 proceeding that were not previously raised before the
Board.  See Boston Scientific Scimed, Inc. v. Medtronic Vascular,
Inc., 497 F.3d 1293, 1298 (Fed. Cir. 2007); Conservolite, 21 F.3d
at 1102; cf. Hyatt, 625 F.3d at 1335.

For an issue to be considered adequately raised before the Board, "the issue should have been raised as specified in the PTO's interference rules." Conservolite, 21 F.3d at 1102. Furthermore, an issue may be deemed to have been properly raised only "if the record clearly demonstrates that it was placed before the examiner-in-chief and one or more parties insisted that the issue be resolved in the interference." Id. The Court may, however, exercise its discretion to adjudicate new issues not raised before the Board under the appropriate circumstances. Id. Such circumstances include "an intervening change in the law, the presence of a new issue, or the admission of other evidence deserving of a response or further elaboration." Id.

Troy contends that he did challenge the Board's priority determination by seeking leave to file a motion for judgment of inequitable conduct, which the Board denied. Further Mem. Law Stephen P. Troy, Jr. Supp. Count I ("Troy's Further Mem.") 10, ECF No. 59; see also Troy's Further Mem., Ex. A, Troy Motions List, ECF No. 59-1. Troy has failed, however, to articulate where in the record he actually presented arguments to the Board regarding the alleged inequitable conduct of Samson. Troy only directs the Court to a line item on a proposed motion list to prove that he raised the issue before the Board. See Troy's Further Mem. 10. Without corroboration, the Court cannot speculate as to the content of a motion that was proposed but

12

A12

never filed.

Thus, it is not apparent from the record that the Board had the occasion to address this issue.  Moreover, Troy has failed to demonstrate that this case presents an appropriate circumstance for the Court to exercise its discretion to consider a new legal issue.  Accordingly, the Court declines to exercise its discretion to adjudicate this new issue.

### 2.   Actual Reduction to Practice

As the junior party in the interference proceeding, Troy bears the burden in the present Section 146 action of establishing priority of invention.  See Streck, 659 F.3d at 1191 (stating that because "a § 146 action is a new civil proceeding subject to de novo determination," the burden of proof rests with the junior party).  Troy can establish priority by showing an actual reduction to practice of the invention that occurred prior to Samson's constructive reduction to practice on January 18, 2005.  See Eaton v. Evans, 204 F.3d 1094, 1097 (Fed. Cir. 2000).  In order to establish an actual reduction to practice, Troy must demonstrate that (1) he has "constructed an embodiment or performed a process" to meet every element of Claim 3; and (2) "the embodiment or process operated for its intended purpose."  Id.; accord Cooper, 154 F.3d at 1328.

Troy claims that an actual reduction to practice occurred between January and February 2004.  See Interference R. at 222.

13

The Board's decision explains that Troy relied heavily on his own testimony and failed to provide sufficient corroborating evidence to establish an actual reduction to practice.  Id. at 893.  In the present action, Troy introduced a new affidavit to supplement the prior testimony that he submitted to the Board.  See Aff. Stephen P. Troy, Jr. ("Troy Aff."), ECF No. 49.  Without adequate corroboration, however, Troy's new testimony remains insufficient to prove an actual reduction to practice.  See Price, 988 F.2d at 1194 (declaring that corroboration is required to prove priority of invention and derivation); AlphaVax, 719 F. Supp. 2d at 164 (citing Singh v. Brake, 222 F.3d 1362, 1367 (Fed. Cir. 2000)) (noting that the declaration of an inventor is "insufficient as a matter of law to establish priority"); Invitrogen, 578 F. Supp. 2d at 256 (observing that the Board "may not rely on the inventor's own declaration to establish facts regarding [an actual reduction to practice]").  Troy's newly proffered affidavit does little to fill the evidentiary gaps in the record and is insufficient to establish an actual reduction to practice prior to February 2004.

Troy also relies on various undated photographs of the Troy Rail to corroborate his testimony that an actual reduction to practice occurred between January and February 2004.  See Interference R. at 886-89, 2896-97.  Despite the resemblance between the photographs and the subject matter of Claim 3, Troy

14

A14

did not account for all of the five very specific elements contained therein.  <u>See</u> <u>id.</u> at 886-89.  Even if all five elements were present, the photographs -- being undated -- are insufficient to corroborate Troy's testimony that a reduction to practice occurred prior to the Critical Date.

Additionally, Troy introduced into evidence an invoice, dated February 2, 2004, for orders of the Troy Rail taken during the annual Shooting Hunting and Outdoor Trade Show (the "SHOT Show").  <u>See</u> <u>id.</u> at 2904; <u>see also</u> Joint Pretrial Mem. 4, 17, ECF No. 43.  The Board correctly concluded that the invoice had little significance with respect to accounting for the five elements of Claim 3.  <u>See</u> Interference R. at 891.  The invoice merely lists the orders placed for the Troy Rail products without describing in detail their specific components.  <u>See</u> <u>id.</u> at 2904. This does not establish what Troy asserts: that the invention described in Claim 3 was sold during the SHOT Show.

Furthermore, Troy cites a portion of Samson's prior sworn testimony in a state court action that confirms that Samson accompanied Troy to the SHOT Show in order to support Troy's efforts.  <u>See</u> <u>id.</u> at 890; <u>see also</u> <u>id.</u> at 2970.  The Board rightly determined that Samson's testimony showed only that Samson attended the SHOT Show with Troy; it did not serve to corroborate an actual reduction to practice, as Troy suggests. <u>See</u> <u>id.</u> at 892.

The Board also considered a receipt from Applied Light, Inc. ("Applied Light") for laser engraving services for several Troy Rail prototypes and accompanying photographs.  <u>Id.</u> at 890; <u>see also id.</u> at 2899, 2901-02.  The Board justly concluded that the photographs failed to identify every element of Claim 3.  <u>Id.</u> at 890-91.  Moreover, the receipt merely describes the laser services performed and not the various parts of the Troy Rail prototype.  <u>Id.</u>  In order to supplement the record before the Board, Troy submitted to this Court the affidavit of Preston Macy ("Macy"), the General Manager of Applied Light.  Aff. Preston Macy, ECF No. 44.  Macy confirms that Applied Light performed laser engraving services on myriad Troy Rail prototypes, <u>id.</u> ¶ 3, but that Troy had only two particular parts of the rail engraved: "a one sided lower handguard rail, and a three sided upper handguard rail," <u>id.</u> ¶ 4.  This new evidence, even considered in tandem with the entirety of the record, does not establish all five elements of Claim 3.

Lastly, Troy relies on the affidavit of Cass Chin ("Chin"), the manager of a weapons and weapons accessories review website, and the deposition of Robert Conley ("Conley"), who prepared manufacture drawings for Troy's weapons manufacturing firm, Troy Industries, Inc. ("Troy Industries"), to prove that an actual reduction to practice occurred no later than July 2004.  <u>See</u> Aff. Cass Chin, ECF No. 48; Troy Aff. ¶¶ 85-93.  The testimony of both

16

Chin and Conley concerns events that occurred after February
2004, the latest reduction-to-practice date claimed in the
interference proceeding.  A party is generally precluded from
raising issues or theories of law in a Section 146 proceeding
that were not previously raised before the Board.  <u>Boston
Scientific Scimed</u>, 497 F.3d at 1298 (stating that a party is
precluded from advancing "new legal theories at the trial court
level, even if the overarching legal issue was presented below");
<u>Conservolite</u>, 21 F.3d at 1102 ("While the expression '<u>de novo</u>' is
often used to describe a § 146 action, the statute does not . . .
state that new issues can freely be raised.").  Troy provides no
justification for not raising the new reduction-to-practice date
during the interference proceeding and is thus prohibited from
doing so in this action.  <u>See Invitrogen</u>, 578 F. Supp. 2d at 253-
55 (suggesting that the plaintiff may not raise a new reduction-
to-practice date that was not presented to the Board).

On the basis of the record before the Board and the newly
proffered evidence, Troy has not accounted for all five elements
of Claim 3.  As a result, Troy has failed to establish that an
actual reduction to practice occurred prior to February 2004.

### 3.   Conception

Troy's failure to establish an actual reduction to practice
requires him to demonstrate that he conceived of the invention
described in Claim 3 in order to prove inurement or derivation.

See Genentech, Inc. v. Chiron Corp., 220 F.3d 1345, 1354 (Fed. Cir. 2000); Price, 988 F.2d at 1190.  "Conception is the formation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice."  Cooper, 154 F.3d at 1327. Troy must prove possession of every feature recited in Claim 3 by a preponderance of the evidence in order to demonstrate conception.  See Griffin v. Bertina, 285 F.3d 1029, 1032 (Fed Cir. 2002); Kridl v. McCormick, 105 F.3d 1446, 1449 (Fed. Cir. 1997).  Furthermore, Troy may not rely solely on his own testimony; corroboration is required to establish conception. See University of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Hedrick, 573 F.3d 1290, 1298 (Fed. Cir. 2009).

Troy's earliest claimed corroborated date of conception of the subject matter of Claim 3 is April 2003.  See Interference R. at 222.  In addition, Troy proffered four alternative dates of conception to the Board: June 2003, July 2003, November 2003, and January 2004.  Id. at 896-902.

First, to demonstrate conception in April 2003, Troy claims that he began working on design concepts and drawings of the Troy Rail in January 2003, see Troy Aff. ¶ 8, and that he offered in evidence a drawing of the Troy Rail, Interference R. at 2847, which he allegedly disclosed to Samson in April 2003 for the purposes of machining the product, see id. at 2838; Troy Aff. ¶

18

A18

10.  The drawing, however, is undated and bears no indication of
its creator.  Moreover, the drawing does not clearly depict lug
rails, a clamp assembly, or a detent assembly, as required to
establish conception.  <u>See</u> Interference R. at 2847.  Troy also
relies on a confidentiality agreement signed by Samson prior to
the beginning of their business relationship in order to show
that he disclosed the Troy Rail concept to Samson in April 2003
with the expectation that Samson would maintain any information
shared by Troy in confidence.  Troy's Mem. 5, 8-9.  The
confidentiality agreement does not describe the specific work
performed by Samson on behalf of Troy.  As the Board correctly
determined, the confidentiality agreement merely provides that
all documentation and confidential business information
concerning the development of a handguard rail disclosed to
Samson remains Troy Industries' property.  <u>See</u> Interference R. at
903.  It does not, however, set forth the specific elements of
Claim 3; therefore, it is insufficient to corroborate Troy's
assertion that the invention was conceived of and disclosed to
Samson in April 2003.

     Second, to show conception in June 2003, Troy relies on two
computer-generated solid model images of the Troy Rail and the
testimony of David Beaudet ("Beaudet"), who prepared the images
after reportedly meeting with Troy in June or July 2003.  Troy's
Mem. 10; <u>see also</u>, Interference R. at 1181, 1185.  Troy argues

19

A19

that the images, corroborated by Beaudet's testimony, show four elements of Claim 3: the upper rail, the lower lug rail, a two-piece clamping assembly, and interrupted lug rails.  Troy's Mem. 11.  An analysis of the images and Beaudet's testimony shows that they do not demonstrate the specific subject matter of Claim 3, which also requires a detent assembly, lug rails on the upper portion, and lugs spaced apart extending from each end of the lower portion.  Since proof of conception requires the inventor to show that he conceived of <u>every</u> element of the invention, Troy has failed to prove conception by June 2003.  <u>See</u> <u>Kridl</u>, 105 F.3d at 1449.

Third, Troy relies on two emails sent from Troy to Samson in July 2003 to demonstrate conception of the clamp assembly in July 2003.  Troy's Mem. 11-12.  Troy also introduced the affidavit of Anthony William Lawrence ("Lawrence"), a seller of ergonomic rifle stocks, to supplement the record before the Board.  Aff. Anthony William Lawrence ("Lawrence Aff."), ECF No. 45.  The two emails and Lawrence's testimony describe the mechanism Troy intended to adopt as a clamping assembly for the Troy Rail.  <u>See</u> Interference R. at 2863-64, 2866; Lawrence Aff.  This evidence supplements Troy's previous showing of a clamp assembly for the June 2003 conception date but does not account for the remaining elements of Claim 3.  As a result, Troy has not demonstrated that he conceived of every element of Claim 3 by July 2003.

20

A20

Fourth, to establish conception in November 2003, Troy submitted two drawings that illustrated improvements made to the Troy Rail concept between April and November 2003. See Interference R. at 899, 2860-61. The drawings, however, do not depict a detent assembly carried by a clamp assembly, lug rails on the upper portion, and lugs spaced apart extending from each end of the lower portion. See id. at 2860-61. Furthermore, the drawings are undated, and Troy has not corroborated his testimony that he created the drawings. Consequently, the drawings are inadequate to establish conception in November 2003.

Lastly, Troy submitted two exhibits in order to demonstrate conception in January 2004. The two exhibits detail an invoice for the purchase of an extrusion die necessary for manufacturing the Troy Rail and an extrusion print (which is a cross-sectional diagram of the Troy Rail). Id. at 2868, 2870-92, 2894. Neither the invoice nor the extrusion print have any accompanying explanations, and it is not evident that all the elements of Claim 3 are accounted for. The extrusion print is a diagram of the cross-section of the Troy Rail and, therefore, the detent assembly carried by the clamp assembly is not demonstrated. In order to cure this deficiency, Troy proffered the affidavit of John Chudzik, a head armorer for a police department, to corroborate Troy's testimony that he conceived of a spring detent assembly concept in January 2004. See Aff. John Chudzik ¶¶ 5-11,

21

A21

Case: 13-1565 Case: 13-1565 FOR PARTICIPANTS ONLY Document: 91 Document: 13 Page: 95 Filed: 11/14/2013 Page: 95 Filed: 11/14/2013

Case 1:11-cv-10384-WGY Document 67 Filed 04/30/13 Page 22 of 24

ECF No. 47. Despite this new evidence, Troy has not demonstrated that several other elements of Claim 3 were conceived of by January 2004, including lug rails on the upper portion and spaced apart lugs extending from each end of the lower portion of the handguard.

Accordingly, this Court determines that Troy has failed to demonstrate that he conceived of all the elements of Claim 3 by a preponderance of the evidence on any of the asserted dates of conception.[7]

### 4. Inurement

Troy argues that Samson's actions in reducing the invention to practice inured to the benefit of Troy as a result of the confidentiality agreement and business relationship between the parties. Troy's Mem. 17. "Inurement involves a claim by an inventor that, as a matter of law, the acts of another person should accrue to the benefit of the inventor." Cooper, 154 F.3d

---

[7] The Court acknowledges, as it must, that Troy has proved (1) that Samson improperly submitted to the PTO as its own at least one drawing of Troy's and (2) that Samson violated a confidentiality agreement with Troy Industries in the course of developing its patented inventions, occasioning $499,500 in damages. See Troy Indus., Inc. v. Samson Mfg. Corp., No. 09-P-1571, 2012 WL 931641, at *2 (Mass. App. Ct. Mar. 21, 2012). While these actions may constitute inequitable conduct by Samson, see generally Thomas F. Cotter, An Economic Analysis of Patent Law's Inequitable Conduct Doctrine, 53 Ariz. L. Rev. 735 (2011) -- a matter as to which this Court expresses no opinion -- neither action proves Troy conceived of all the elements of Claim 3 and timely reduced them to practice (the issue before the Board).

at 1331.  In order to demonstrate inurement, Troy must show that
Samson was working either explicitly or implicitly at Troy's
request.  See id.  Furthermore, the following three requirements
must be satisfied: (1) "the inventor must have conceived of the
invention"; (2) "the inventor must have had an expectation that
the embodiment tested would work for the intended purpose of the
invention"; and (3) "the inventor must have submitted the
embodiment for testing for the intended purpose of the
invention."  Genentech, 220 F.3d at 1354.

Troy claims Samson acted on its behalf because, after
signing the confidentiality agreement, Troy "entered into two
purchase orders with Samson whereby Samson agreed to machine the
[Troy Rail]."  Troy's Mem. 17.  Troy's argument fails, however,
because Troy has not shown that he conceived of the invention by
a preponderance of the evidence, as required to establish
inurement.  See Genentech, 220 F.3d at 1354.

### 5.  Derivation

Troy contends that he is entitled to judgment on the basis
of derivation.  Troy's Mem. 18.  "A claim that a patentee derived
an invention addresses originality" -- that is to say, derivation
turns on the question of "who invented the subject matter of the
count?"  Price, 988 F.2d at 1190.  Troy may show that Samson did
not invent the subject matter of the '665 Application by
establishing derivation.  See Brand v. Miller, 487 F.3d 862, 869

23

A23

(Fed. Cir. 2007) ("A party may . . . assert that the patentee did not invent the patented invention by showing derivation."). To prove derivation, Troy must "establish prior conception of the claimed subject matter," id. (quoting Price, 988 F.2d at 1190) (internal quotation marks omitted), and show "communication of that conception to the patentee that is sufficient to enable [him] to construct and successfully operate the invention," id. at 869-70 (alteration in original) (quoting International Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1376 (Fed. Cir. 2004)) (internal quotation marks omitted).

As explained above, Troy has not sufficiently demonstrated prior conception of the invention by a preponderance of the evidence. As a result, Troy has failed to establish that Samson derived the subject matter of Claim 3.

**III. CONCLUSION**

For the reasons stated above, the Court orders that judgment be entered AGAINST Troy upon Count I of the Complaint, ECF No. 1, and that the Board's order cancelling Claims 1-13 of U.S. Patent No. 7,216,451 be AFFIRMED.

> **SO ORDERED.**

/s/William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

A24

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 6/12/2013 at 7:29 AM EDT and filed on 6/11/2013
**Case Name:**    Troy v. Samson Manufacturing Corporation et al
**Case Number:**    1:11-cv-10384-WGY
**Filer:**
**WARNING: CASE CLOSED on 06/20/2012**
**Document Number:** 80(No document attached)

**Docket Text:**
**Judge William G. Young: ELECTRONIC ORDER entered: Since an appeal has been taken in this case, this Court lacks jurisdiction to act on the pending motions other than in aid of the appeal. In aid of the appeal, therefore, this Court indicates that no notice or suggestion of bankruptcy was ever filed. If this Court had jurisdiction, it would deny the motion for reconsideration on the merits and deny the motion to amend as untimely. re [69] Motion for Reconsideration and [72] Motion to Amend Complaint (Paine, Matthew)**

**1:11-cv-10384-WGY Notice has been electronically mailed to:**

Damian R. LaPlaca    dlaplaca@donovanhatem.com, ltraver@donovanhatem.com

Robert J. O'Regan    RoRegan@burnslev.com

Paul J. Hayes    phayes@hbcllc.com, jarrigo@hbcllc.com, mmason@hbcllc.com

Laura L. Carroll    LCarroll@burnslev.com, aleary@burnslev.com

Patricia B. Gary    pgary@donovanhatem.com

Thomas J. Schlesinger    tschlesinger@lbbslaw.com

A25

Ann Lamport Hammitte    ahammitte@ll-a.com, emailservice@ll-a.com,
sstutzmann@lalaw.com

Howard J. Susser    Hsusser@burnslev.com, jdoyle@burnslev.com

Paul J. Cronin    pcronin@hbcllc.com, jarrigo@hbcllc.com, mmanning@hbcllc.com,
mmason@hbcllc.com

Kevin Gannon    kgannon@hbcllc.com, jcrowley@hbcllc.com, mmanning@hbcllc.com

Thomas P. McNulty    tmcnulty@lalaw.com, emailservice@ll-a.com

Zachary R. Gates    zgates@burnslev.com, nmurphy@burnslev.com

Jacob W. Schneider    jschneider@hbcllc.com

**1:11-cv-10384-WGY Notice will not be electronically mailed to:**

Sarah K. Willey
Donovan Hatem, LLP
Two Seaport Lane
8th Floor
Boston, MA 02210

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STEPHEN P. TROY, JR.,                )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        CIVIL ACTION
                                     )        NO. 11-CV-10384-WGY
SAMSON MANUFACTURING CORPORATION     )
and ATLANTIC RESEARCH MARKETING      )
SYSTEMS, INC.,                       )
                                     )
            Defendants.              )
                                     )

## FINAL JUDGMENT

July 15, 2013

Young, U.S.D.J.

On March 7, 2011, Plaintiff Stephen P. Troy, Jr. ("Troy"), filed a Complaint against

Defendants Samson Manufacturing Corporation ("Samson Mfg.") and Atlantic Research

Marketing Systems, Inc. ("A.R.M.S."). Troy's Complaint contained three counts. Count I and

Count III were claims against Samson Mfg. Count I was an appeal by Troy pursuant to 35

U.S.C. § 146 of a decision by the Board of Patent Appeals and Interferences (the "Board") at the

U.S. Patent and Trademark Office, in which the Board ruled that Troy had not demonstrated

priority of invention and ordered that Troy's patent, U.S. Patent No. 7,216,451 ("the '451

Patent"), be cancelled. Count III asserted that certain products made and sold by Samson Mfg.

infringe the '451 Patent. Count II of the Complaint was a claim by Troy against A.R.M.S.

pursuant to 35 U.S.C. § 291, in which Troy sought a declaration of priority of the '451 Patent

over a patent held by A.R.M.S.

A27

Samson Mfg. and A.R.M.S. answered the Complaint.  Samson Mfg. also asserted two counterclaims against Troy, seeking declarations that the '451 Patent was invalid and that Samson Mfg. was not infringing the '451 Patent.

On July 3, 2012, Troy and A.R.M.S. filed a Joint Stipulation of Dismissal With Prejudice, dismissing with prejudice Count II of Troy's Complaint against A.R.M.S.

In a Memorandum and Order issued on April 30, 2013, the Court ordered that judgment be entered against Troy on Count I of the Complaint, and affirmed the Board's order cancelling the '451 Patent.  The Court then entered Judgment as to Count I on May 1, 2013.

On July 12, 2013, Troy and Samson Mfg. filed a Stipulation of Dismissal Without Prejudice, dismissing the remaining claims and counterclaims in this action, *i.e.*, Count III of the Complaint and Samson Mfg.'s Counterclaims against Troy.

It is hereby ORDERED, ADJUDGED and DECREED, based on the entire record of this civil action, as follows:

1.     Judgment is entered against Troy and in favor of Samson Mfg. on Count I of the Complaint, and the Board's order cancelling the '451 Patent is affirmed, in accordance with the Court's Memorandum and Order of April 30, 2013.

2.     Count II of the Complaint has been dismissed with prejudice.

3.     Count III of the Complaint and Samson Mfg.'s Counterclaims have been dismissed without prejudice.

4.     The Clerk is directed to enter final judgment in accordance with the foregoing.

SO ORDERED this 15th day of July, 2013.

/s/ WILLIAM G. YOUNG
WILLIAM G. YOUNG
United States District Judge

2

A28

US007216451B1

(12) **United States Patent**

Troy

(10) Patent No.: **US 7,216,451 B1**

(45) Date of Patent: **May 15, 2007**

(54) **MODULAR HAND GRIP AND RAIL ASSEMBLY FOR FIREARMS**

(76) Inventor: **Stephen P. Troy**, 289 Chanterwood, Lee, MA (US) 01238

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/351,822**

(22) Filed: **Feb. 10, 2006**

**Related U.S. Application Data**

(60) Provisional application No. 60/652,035, filed on Feb. 11, 2005.

(51) **Int. Cl.**
    *F41C 23/00*     (2006.01)

(52) **U.S. Cl.** ......................................... **42/72**; 42/71.01

(58) **Field of Classification Search** ................. 42/114, 42/115, 116, 117, 124, 142, 143, 146, 72, 42/71.01, 75.01; 89/1.42

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,343,650 A * | 9/1994 | Swan | ......................... 42/117 |
| 5,590,484 A | 1/1997 | Mooney et al. | |
| 6,490,822 B1 | 12/2002 | Swan | |
| 6,499,245 B1 | 12/2002 | Swan | |

| | | | |
|---|---|---|---|
| 6,618,976 B1 * | 9/2003 | Swan | ......................... 42/114 |
| 6,655,069 B2 * | 12/2003 | Kim | ............................ 42/114 |
| 6,779,288 B1 * | 8/2004 | Kim | ............................ 42/72 |
| 6,792,711 B2 | 9/2004 | Battaglia | |
| 6,839,998 B1 | 1/2005 | Armstrong | |
| 7,059,076 B2 | 6/2006 | Stoner et al. | |
| 2003/0230022 A1 | 12/2003 | Battaglia | |
| 2004/0000083 A1 | 1/2004 | Grant, Jr. | |

* cited by examiner

*Primary Examiner*—Michael J. Carone
*Assistant Examiner*—Benjamin P. Lee
(74) *Attorney, Agent, or Firm*—Parsons & Goltry; Robert A. Parsons; Michael W. Goltry

(57) **ABSTRACT**

A modular hand grip for use on a firearm, the modular hand grip includes an upper portion, a lower portion and a coupling assembly. A rearward end of the upper portion is configured to engage a top portion of a barrel nut. Lug rails having gaps therein project from an inner surface of the upper portion at opposing sides and proximate edges thereof. The coupling assembly is engagable with a bottom portion of the barrel nut and is attached to the rearward end of the upper portion. The lower portion has opposing side sections, each terminating at an edge. A plurality of spaced apart lugs extend from each edge and are receivable in the gaps in the lug rails of the upper portion and are translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails.

**13 Claims, 5 Drawing Sheets**







FIG.4



FIG.5

Case: 13-1565 Case: 13-565 PARTICIPANTS ONLY Document: 103 Page: 106 Filed: 11/06/2013 Page: 106 Filed: 11/14/2013



FIG.6

Case: 13-1565 CASE PARTICIPANTS ONLY Document 103 Page 107 Filed: 11/04/2013



FIG.7

US 7,216,451 B1

1

## MODULAR HAND GRIP AND RAIL ASSEMBLY FOR FIREARMS

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application No. 60/652,035, filed 11 Feb. 2005.

### FIELD OF THE INVENTION

This invention relates to firearms accessories.

More particularly, the present invention relates to hand grip and rail accessories.

### BACKGROUND OF THE INVENTION

It is understood that hand-held firearms require some type of handgrip so that the operator can hold the firearm as it is fired. Also, many accessories are available that aid in the proper and/or enhanced operation of firearms and some type of platform or mounting structure is generally provided or available as an accessory for this function. Several problems are prevalent in the firearms industry with respect to hand grip and rail assemblies. Many firearms are operated as automatic or semiautomatic and have a tendency to heat extensively so that handgrips attached directly to the barrel can produce hand burns for the operator if great care is not taken. In addition, anything attached directly to the barrel of a firearm can have a tendency to alter the barrel slightly and any alterations can adversely affect the accuracy of the firearm.

It would be highly advantageous, therefore, to remedy the foregoing and other deficiencies inherent in the prior art.

Accordingly, it is an object the present invention to provide a new and improved hand grip for a firearm.

Another object of the present invention is to provide a handgrip which is not attached to the barrel of a firearm.

And another object of the present invention is to provide a hand grip which can be utilized with existing firearms, and specifically with conventional barrel nuts.

### SUMMARY OF THE INVENTION

Briefly, to achieve the desired objects of the present invention in accordance with a preferred embodiment thereof, provided is a modular hand grip for use on a firearm and for engaging a barrel nut of the firearm. The barrel nut includes a cylindrical portion terminating at a forwardly directed end with a radially outwardly directed flange. The hand grip includes an upper portion having a forward end, a rearward end, an inner surface and an outer surface. A groove is formed in the inner surface of the upper portion perpendicular to a longitudinal axis thereof, and spaced from the rearward end. The groove receives the flange of the barrel nut to align the upper portion and to prevent longitudinal movement thereof. A coupling assembly engages a bottom portion of the barrel nut and is attached to the rearward end of the upper portion. A lower portion is also provided and includes a top section and opposing side sections extending therefrom, each terminating at an edge coupled to the upper portion.

In a further aspect of the present invention the upper portion further includes lug rails projecting from the inner surface at opposing sides and proximate edges thereof. The lug rails extend longitudinally from proximate the forward end to a position proximate the rearward end and include a

2

plurality of gaps formed therein. The lower portion further includes a plurality of spaced apart lugs extending from each edge thereof and receivable in the gaps in the lug rails of the upper portion. The lugs, and thus the lower portion, is translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails

In yet another aspect of the present invention, a detent assembly is carried by the clamp element for engaging the lower portion. The detent assembly includes a plunger detent biased outwardly from a central portion of the clamping element and received in an aperture formed through a rearward end of the top section when the lugs are positioned under the lug rails.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and further and more specific objects and advantages of the invention will become readily apparent to those skilled in the art from the following detailed description of a preferred embodiment thereof, taken in conjunction with the drawings in which:

FIG. 1 is a perspective view of a modular hand grip assembly according to the present invention;

FIG. 2 is a bottom plan view of the modular hand grip assembly of FIG. 1;

FIG. 3 is an end view of the modular hand grip of FIGS. 1 and 2;

FIG. 4 is an exploded perspective view of the modular hand grip according to the present invention;

FIG. 5 is a perspective view of an upper portion of the modular hand grip;

FIG. 6 is a perspective view of the lower portion of the modular hand grip; and

FIG. 7 is a perspective view of a firearm including the modular handgrip of FIGS. 1–6.

### DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

Turning now to the drawings in which like reference characters indicate corresponding elements throughout the several views, attention is directed to FIGS. 1–3 which illustrate a modular hand grip according to the present invention, generally designated 10. Modular hand grip 10 includes three main elements, an upper portion 12, a lower portion 14, and a coupling assembly 15. Upper portion 12 can, and preferably does include a rail 17 provided to permit the coupling of additional accessory devices. Modular hand grip 10 is removably coupled to the fore-end of a firearm, providing a grip, rail, and rail alignment assembly.

With reference to FIGS. 4, 5, and 6, modular hand grip 10 is coupled to a firearm 100 (illustrated in FIG. 7) through engagement with a barrel nut 20. Firearm 100 includes a receiver 110 and a barrel 112. For purposes of this description, the term forwardly is intended to refer to the direction toward a muzzle 114 of firearm 100, and rearwardly is directed toward receiver 110. Barrel 112 is coupled to receiver 110 with barrel nut 20. Barrel nut 20 typically includes a threaded cylindrical portion 22 terminating at a forwardly directed end 24, with a radially outwardly directed flange 23. Upper portion 12 includes a forward end 24, a rearward end 25, an inner surface 27 and an outer surface 28. Upper portion 12 forms a portion of a tubular enclosure terminating in edges 29 and completed by lower portion 14. Upper portion 12 and lower portion 14 encircle barrel 112 of firearm 100 when installed. Rearward end 25 is configured to substantially engage a top portion of barrel nut 20. A

A50

US 7,216,451 B1

3

groove **30** is formed in inner surface **27** of upper portion **12**, perpendicular to a longitudinal axis thereof, and spaced from rearward end **25**. Groove **30** is positioned to receive flange **23** of a conventional factory barrel nut such as barrel nut **20**. Receipt of barrel nut **20** in groove **30** serves to align upper portion **12** with the rest of firearm **100**, (FIG. **7**), and longitudinally retain upper portion **12**, preventing forward and rearward movement thereof. Upper portion **12** serves as the anchor for modular hand grip **10**.

Further securing upper portion **12** to barrel nut **20**, is coupling assembly **15**. Coupling assembly **15** consists of a clamp element **32** having a central semicircular recess **33** configured to receive cylindrical portion **22** of barrel nut **20**, and flanges **34** extending to opposing sides. Clamp element **32** is attached to rearward end **25** of upper portion **12** with fasteners that are inserted through openings in flanges **34** and into threaded holes formed in engagement portions **31** of edges **29** of upper portion **12**. Engagement portions **31** are flattened and recessed below edges **29** to accommodate flanges **34**. Upper portion **12** is positioned with flange **23** of barrel nut **20** received in groove **30** and secured in position by clamp element **32** positioned around barrel nut **20** and the fasteners installed and tightened into the threaded holes in engagement portions **31** of upper portion **12**. When the fasteners are installed and tightened, clamp element **32** and upper portion **12** are drawn together securely engaging barrel nut **20**. There can be one or more fasteners per side as desired. The presence of groove **30** acts to automatically align upper portion **12** with the rest of the firearm. Thus, for example, a rail carried by, or formed as, part of upper portion **12** will be aligned with the rail typically present on an upper receiver of the firearm. While adjustments can be made during fabrication, the preferred alignment is intended to match with factory flattop Mil-std 1913 specifications.

Upper portion **12** further includes lug rails **42** extending from opposing sides thereof proximate edges **29**. Lug rails **42** extend longitudinally from a forward end **24** to a position proximate groove **30**. Lug rails **42** include a plurality of gaps **43** formed therein for purposes which will be discussed presently. Lower portion **14** completes the tubular aspect of modular hand grip **10** when engaged with upper portion **12**. Lower portion **14** includes a top section **50** and opposing side sections **52** extending therefrom and terminating at edges **53**. A plurality of spaced apart lugs **55** extend from opposing edges **53** and are configured to be received in gaps **43** in lug rails **42** of upper portion **12**. Thus, lower portion **14** is coupled to upper portion **12** by properly aligning lower portion **14** and inserting lugs **55** through gaps **43**. Lower portion **14** is then translated in a rearward direction locking lugs **55** under lug rails **42**. This securely attaches lower portion **14** to upper portion **12** substantially along its entire length. Further translational motion forwardly or rearwardly is prevented by a detent assembly **60** as part of the coupling or clamp assembly **15** and carried by clamp element **32**.

Detent assembly **60** includes a plunger detent **62** received by a central portion of clamping element **32**. Plunger detent **62** is biased outwardly from barrel nut **20**, preferably by a compression spring **63**. As lower portion **14** is translated rearwardly with lugs **55** engaging upper portion **12** under lug rails **32**, an aperture **65** formed through a rearward end of top section **50** aligns with plunger detent **62** which is received therein. With plunger detent **62** received in aperture **65**, further translational movement of lower portion **14** is prevented.

With reference to FIGS. **1** and **4**, an additional feature of modular hand grip **10** is anti-rotational studs **70** extending from a rearward surface of clamp element **32**. Studs **70**

4

engage the receiver of a firearm, and prevent rotation of hand grip **10**. Rotation of hand grip **10**, since it is attached only to barrel nut **20**, can act to unscrew barrel nut **20**, rotating barrel nut **20** in a loosening direction, which is highly undesirable. Thus, studs **70** prevent this action by contacting the receiver. One or more studs **70** can be employed. One being sufficient, as loosening of the barrel nut occurs in one rotational direction, preventable by one stud **70**. Another stud can be employed to prevent rotation of the barrel nut in a tightening direction if desired. It is also understood that a stud can extend from upper portion **14**, lower portion **12** or, as illustrated, clamp **15**.

Various changes and modifications to the embodiments herein chosen for purposes of illustration will readily occur to those skilled in the art. To the extent that such modifications and variations do not depart from the spirit of the invention, they are intended to be included within the scope thereof, which is assessed only by a fair interpretation of the following claims.

Having fully described the invention in such clear and concise terms as to enable those skilled in the art to understand and practice the same, the invention claimed is:

**1**. A modular hand grip for use on a firearm, the modular hand grip comprising:

an upper portion having a forward end, a rearward end, an inner surface and an outer surface, the rearward end is configured to engage a top portion of a barrel nut;

lug rails project from the inner surface of upper portion at opposing sides and proximate edges thereof, the lug rails extend longitudinally from proximate the forward end to a position proximate the rearward end and include a plurality of gaps formed therein;

a clamp assembly for engaging a bottom portion of the barrel nut is attached to the rearward end of the upper portion, the clamp assembly includes a clamp element having a central recess configured to receive the barrel nut, and flanges extending to opposing sides and attached to the edges at the rearward end of the upper portion, wherein the flanges are attached to the rearward end with fasteners that are inserted through openings in the flanges and into holes in engagement portions of the edges of the upper portion; and

a lower portion having a top section and opposing side sections extending therefrom and each terminating at an edge, a plurality of spaced apart lugs extending from each edge and receivable in the gaps in the lug rails of the upper portion and translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails.

**2**. A modular hand grip as claimed in claim **1** wherein a groove is formed in the inner surface of the upper portion, perpendicular to a longitudinal axis thereof, and spaced from the rearward end, to receive the flange of a conventional factory barrel nut.

**3**. A modular hand grip for use on a firearm, the modular hand grip comprising:

an upper portion having a forward end, a rearward end, an inner surface and an outer surface, the rearward end is configured to engage a top portion of a barrel nut;

lug rails project from the inner surface of upper portion at opposing sides and proximate edges thereof, the lug rails extend longitudinally from proximate the forward end to a position proximate the rearward end and include a plurality of gaps formed therein;

a clamp assembly for engaging a bottom portion of the barrel nut is attached to the rearward end of the upper portion;

A51

US 7,216,451 B1

5

a lower portion having a top section and opposing side sections extending therefrom and each terminating at an edge, a plurality of spaced apart lugs extending from each edge and receivable in the gaps in the lug rails of the upper portion and translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails; and

a detent assembly carried by the clamp assembly for engaging the lower portion.

4. A modular hand grip as claimed in claim 3 wherein the detent assembly includes a plunger detent biased outwardly from a central portion of the clamping assembly and received in an aperture formed through a rearward end of the top section when the lugs are positioned under the lug rails.

5. A modular hand grip as claimed in claim 4 wherein the plunger detent is biased outwardly by a compression spring.

6. A modular hand grip for use on a firearm, the modular hand grip comprising:

a barrel nut including a cylindrical portion terminating at a forwardly directed end with a radially outwardly directed flange;

an upper portion having a forward end, a rearward end, an inner surface and an outer surface;

a groove formed in the inner surface of the upper portion, perpendicular to a longitudinal axis thereof, and spaced from the rearward end, the groove receiving the flange of the barrel nut to align the upper portion and to prevent longitudinal movement thereof;

a clamp assembly engaging a bottom portion of the barrel nut and attached to the rearward end of the upper portion, the clamp assembly includes a clamp element having a central semicircular recess receiving the cylindrical portion of the barrel nut, and flanges extending to opposing sides and attached to the edges at the rearward end of the upper portion, wherein the flanges are attached to the rearward end with fasteners that are inserted through openings in the flanges and into holes in engagement portions of the edges of the upper portion; and

a lower portion having a top section and opposing side sections extending therefrom and each terminating at an edge coupled to the upper portion.

7. A modular hand grip for use on a firearm, the modular hand grip comprising:

a barrel nut including a cylindrical portion terminating at a forwardly directed end with a radially outwardly directed flange;

an upper portion having a forward end, a rearward end, an inner surface and an outer surface;

a groove formed in the inner surface of the upper portion, perpendicular to a longitudinal axis thereof, and spaced from the rearward end, the groove receiving the flange of the barrel nut to align the upper portion and to prevent longitudinal movement thereof;

a clamp assembly engaging a bottom portion of the barrel nut and attached to the rearward end of the upper portion;

a lower portion having a top section and opposing side sections extending therefrom and each terminating at an edge coupled to the upper portion;

a detent assembly carried by the clamp assembly for engaging the lower portion; and

wherein the upper portion further includes lug rails projecting from the inner surface at opposing sides and proximate edges thereof, the lug rails extending longitudinally from proximate the forward end to a position proximate the rearward end and including a plurality of

6

gaps formed therein, and the lower portion further includes a plurality of spaced apart lugs extending from each edge thereof and receivable in the gaps in the lug rails of the upper portion and translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails.

8. A modular hand grip as claimed in claim 7 wherein the detent assembly includes a plunger detent biased outwardly from a central portion of the clamping assembly and received in an aperture formed through a rearward end of the top section when the lugs are positioned under the lug rails.

9. A modular hand grip as claimed in claim 8 wherein the plunger detent is biased outwardly by a compression spring.

10. A modular hand grip on a firearm comprising:

a firearm having a receiver, a barrel, and a barrel nut including a cylindrical portion terminating at a forwardly directed end with a radially outwardly directed flange, the barrel nut coupling the barrel to the receiver;

an upper portion having a forward end, a rearward end, an inner surface and an outer surface;

a groove formed in the inner surface of the upper portion, perpendicular to a longitudinal axis thereof, and spaced from the rearward end, the groove receiving the flange of the barrel nut to align the upper portion with the receiver and to prevent longitudinal movement thereof;

a clamp assembly engaging a bottom portion of the barrel nut and attached to the rearward end of the upper portion, the clamp assembly includes a clamp element having a central semicircular recess receiving the cylindrical portion of the barrel nut, and flanges extending to opposing sides and attached to the edges at the rearward end of the upper portion, the flanges are attached to the rearward end with fasteners that are inserted through openings in the flanges and into holes in engagement portions of the edges of the upper portion; and

a lower portion having a top section and opposing side sections extending therefrom and each terminating at an edge coupled to the upper portion, the upper portion and the lower portion encircling the barrel.

11. A modular hand grip as claimed in claim 10 wherein the upper portion further includes lug rails projecting from the inner surface at opposing sides and proximate edges thereof, the lug rails extending longitudinally from proximate the forward end to a position proximate the rearward end and including a plurality of gaps formed therein, and the lower portion further includes a plurality of spaced apart lugs extending from each edge thereof and receivable in the gaps in the lug rails of the upper portion and translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails.

12. A modular hand grip on a firearm comprising:

a firearm having a receiver, a barrel, and a barrel nut including a cylindrical portion terminating at a forwardly directed end with a radially outwardly directed flange, the barrel nut coupling the barrel to the receiver;

an upper portion having a forward end, a rearward end, an inner surface and an outer surface;

a groove formed in the inner surface of the upper portion, perpendicular to a longitudinal axis thereof, and spaced from the rearward end, the groove receiving the flange of the barrel nut to align the upper portion with the receiver and to prevent longitudinal movement thereof;

a clamp assembly engaging a bottom portion of the barrel nut and attached to the rearward end of the upper portion; and

A52

US 7,216,451 B1

7

a lower portion having a top section and opposing side
sections extending therefrom and each terminating at
an edge coupled to the upper portion, the upper portion
and the lower portion encircling the barrel;
the upper portion further includes lug rails projecting
from the inner surface at opposing sides and proximate
edges thereof, the lug rails extending longitudinally
from proximate the forward end to a position proximate
the rearward end and including a plurality of gaps
formed therein, and the lower portion further includes
a plurality of spaced apart lugs extending from each
edge thereof and receivable in the gaps in the lug rails

8

of the upper portion and translatable in one of a forward
direction and a rearward direction positioning the lugs
under the lug rails; and
a detent assembly carried by the clamp assembly for
engaging the lower portion.
**13**. A modular hand grip as claimed in claim **12** wherein
the detent assembly includes a plunger detent biased out-
wardly from a central portion of the clamping assembly and
received in an aperture formed through a rearward end of the
top section when the lugs are positioned under the lug rails.

\* \* \* \* \*

BoxInterferences@uspto.gov
Telephone: 571-272-4683

Paper 203
Entered: 6 January 2011

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

———————————

STEPHEN P. **TROY**
Junior Party
(Patent No. 7,216,451),

v.

SCOTT W. **SAMSON**
and KENNETH LANKARGE
Senior Party
(Application No. 11/326,665).

———————————

Patent Interference No. 105,698 (SCM)
(Technology Center 3600)

*Before* RICHARD E. SCHAFER, JAMESON LEE, and SALLY C.
MEDLEY, *Administrative Patent Judges.*

MEDLEY, *Administrative Patent Judge.*

DECISION - PRIORITY - Bd.R. 125

IR000880

Interference 105,698

SUMMARY OF MOTIONS AND DECISION

Troy seeks judgment against Samson on the basis of priority of invention. (Troy Priority Motion 1 (Substitute); Paper 36).

We DENY Troy Priority Motion 1 (Substitute).

Samson seeks judgment against Troy on the basis of priority of invention. (Samson Priority Motion 1; Paper 37).

We DISMISS Samson Priority Motion 1.

Troy seeks to exclude certain Samson evidence. (Troy Miscellaneous Motion 2; Paper 72).

We DISMISS Troy Miscellaneous Motion 2.

Samson seeks to exclude certain Troy evidence. (Samson Miscellaneous Motion 3; Paper 67).

We DISMISS Samson Miscellaneous Motion 3.

OPINION

I.    INTRODUCTION

The interfering subject matter is related to a modular hand grip for a firearm. Count 1, the sole count, is Troy claim 3 or Samson claim 6. (Paper 1 at 4).

Claim 3 of Troy's patent 7,216,451, which is one alternative of Count 1, is as follows (references to Troy's 7,216,451 figure 4[1], which is reproduced below, are in braces {}):

> A modular hand grip for use on a firearm, the modular
> hand grip comprising:

─────────────
[1] The involved Troy patent was not filed as an exhibit. Accordingly, Troy patent 7,216,451 is entered into the record as Exhibit 3001.

- 2 -

IR000881

Interference 105,698

an upper portion {**Troy Fig. 4, item 12**} having a forward end {**Fig. 4, item 24**}, a rearward end {**Fig. 4, item 25**}, an inner surface {**Fig. 4, item 27**} and an outer surface {**Fig. 4, item 28**}, the rearward end {**Fig. 4, item 25**} is configured to engage a top portion of a barrel nut {**Fig. 4, item 20**};

lug rails {**Fig. 4, item 42**} project from the inner surface of upper portion at opposing sides and proximate edges thereof, the lug rails extend longitudinally from proximate the forward end to a position proximate the rearward end and include a plurality of gaps {**Fig. 4, item 43**} formed therein;

a clamp assembly {**Fig. 4, item 15**} for engaging a bottom portion of the barrel nut {**Fig. 4, item 20**} is attached to the rearward end of the upper portion;

a lower portion {**Fig. 4, item 14**} having a top section {**Fig. 4, item 50**} and opposing side sections {**Fig. 4, item 52**} extending therefrom and each terminating at an edge, a plurality of spaced apart lugs {**Fig. 4, item 55**} extending from each edge and receivable in the gaps {**Fig. 4, item 43**} in the lug rails of the upper portion and translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails; and

a detent assembly {**Fig. 4, item 60**} carried by the clamp assembly {**Fig. 4, item 15**} for engaging the lower portion {**Fig. 4, item 14**}.

- 3 -

IR000882

A1364

Interference 105,698

Troy Figure 4 is reproduced below.



Figure 4 of Troy Patent 7,216,451 shows a modular hand-grip for a firearm.

Troy[2] is involved on the basis of U.S. Patent 7,216,451 ("the '451 patent"), issued 15 May 2007, based on application 11/351,822, filed

---

[2] Inventor Stephen P. Troy is the real party in interest. (Paper 11).

- 4 -

IR000883

A1365

Interference 105,698

10 February 2006.  Samson[3] is involved on the basis of U.S. Patent

Application 11/326,665, filed 6 January 2006 ("the '665 application").

      Troy was accorded benefit for the purpose of priority of

Application 60/652,035, filed 11 February 2005.  (Paper 1 at 4).  Samson

was accorded benefit for the purpose of priority of Application 60/644,890,

filed 18 January 2005.  (Paper 1 at 4).  Thus, Troy's constructive reduction

to practice date is 11 February 2005 and Samson's constructive reduction to

practice date is 18 January 2005.

II.    TROY PRIORITY MOTION

     A.  Overview of Troy's Priority Motion

      Troy alleges that in April 2003 it conceived of the invention (Paper 36

at 2:17) and that on various occasions between April 2003 and February

2004 it communicated its invention to Samson, e.g., that Samson derived the

invention from Troy.  (Paper 36 at 14:10-13).  Troy further alleges that

between February 2, 2004 and February 12, 2004 it actually reduced the

invention to practice[4].  (Paper 36 at 6:1-3).  Troy also argues that all action

taken by Samson during the time between April 9, 2003 and February 2004

---

[3] Samson Manufacturing Corporation is the real party in interest.  (Paper 4).
[4] Although Troy's motion bears material facts with events that are
subsequent to February 2004 (Paper 36 at 22), those facts are apparently not
relied upon in support of Troy's motion.  Troy does not argue or provide any
explanation for events that occurred beyond its February 2004 alleged actual
reduction to practice that would demonstrate priority of invention.
Accordingly, we need not and do not consider the "extra" facts or how those
facts may be combined to show priority of invention.

IR000884

Interference 105,698

inures to Troy's benefit. (Paper 36 at 11:21 to 12:11). Troy does not seek to demonstrate acts of diligence[5]. (Paper 36 at 11:9-11).

    B. Actual Reduction to Practice

      Troy as the junior party must demonstrate priority of invention by a preponderance of the evidence. Bd. R. 207(a)(2). To demonstrate an actual reduction to practice, it must be established that (1) the party constructed an embodiment or performed a process that met every element of the count and (2) the embodiment or process operated for its intended purpose. *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000). Troy has failed to satisfy either prong of the two prong requirement for the following reasons.

      Samson's earliest accorded benefit date, e.g., the critical date, is 18 January 2005. (Paper 1 at 4). Troy alleges that it actually reduced the invention to practice between February 2, 2004 and February 12, 2004, which is prior to the critical date. (Paper 36 at 6:1-3). Troy's reduction to practice showing is based on the inventor Stephen P. Troy's declaration (Ex. 2003; "Mr. Troy"), various photographs (Ex. 2014 and Ex. 2016) and invoices (Ex. 2017 and Ex. 2018).

      According to Troy's motion, Mr. Troy and Scott W. Samson ("Mr. Samson") worked together to create prototypes of the invention for a gun show Troy refers to as the "Shot Show" or "SHOT Show." (Paper 36

---

[5] Troy alternatively argues, in conclusory fashion, that if it were required to show diligence between its April 2003 conception and its February 2004 actual reduction to practice, it has done so. (Paper 36 at 11:13-17). We need not and have not considered whether Troy has sufficiently demonstrated diligence since Troy has not sufficiently demonstrated either a prior conception or an actual reduction to practice.

- 6 -

IR000885

Interference 105,698

at 6:1-3).[6]  Troy relies significantly on Mr. Troy's testimony (Ex. 2003), a
portion of which is reproduced as follows:

> 22.  Between February 2, 2004 and the start of the Shot Show
> that ran from February 12-15, 2004, we worked to create the
> prototypes, reducing my invention to practice in Mr. Samson's
> shop in Whatley, Massachusetts.
>
> 23.  For the SHOT Show, two prototypes were prepared of the
> upper handguard and one of the lower handguard, and two
> clamps.  Photos of those prototypes are collectively Troy
> Exhibit 2014 and individually as Troy Exhibits 2038-2059.
> The original prototypes will be made available upon request.
>
> 24.  In early February, I brought prototypes to Valley Plating,
> Inc. in Springfield, Massachusetts for plating with a Hard Coat
> Aluminum Anodizing, which turns the metal black and
> provides a hard surface that is wear resistant.
>
> 25.  I then brought the prototypes to Applied Light, Inc. for
> laser engraving.  That engraving included our company name,
> Troy Industries, Inc., as can be seen in the photo that is Troy
> Exhibit 2016, as well as Troy Exhibits 2014 and 2038-2059.
> The invoice indicating "Laser engrave for show," with an order
> dated of February 9, 2004 that Applied Light issued to Troy is
> Troy Exhibit 2017.

Troy relies on Exhibit 2014 to show that which was allegedly reduced
to practice.  Troy concludes, without explanation, that Troy Exhibit 2014
shows all the elements of Count 1, including the upper and lower handguard

─────────────────────

[6] Troy also argues that all work performed by Mr. Samson, one of the Senior
party's inventors, was performed for the benefit of Troy, e.g., inurement.
We address that argument below.

- 7 -

IR000886

Interference 105,698

portions, the clamp assembly, lug rails, and a detent. (Paper 36 at 6:5-7 and
10:8-10; Ex. 2003, ¶ 23).

     Neither Troy through its motion, nor Mr. Troy through his testimony,
sufficiently explains the contents of Exhibit 2014. Exhibit 2014 is a two
page document with what appears to be a total of forty-eight smaller
photographs contained on those two pages[7]. The first page, which appears
to us to be the same as the second page, is reproduced below:

---

[7] In his declaration, Mr. Troy refers to Exhibits 2038-2059 as purportedly
showing individually what Exhibit 2014 shows collectively. Exhibits 2038-
2059 are not listed in Troy Priority Motion 1, Appendix 1: List of Exhibits,
nor are the Exhibits referred to in Troy Priority Motion 1. The exhibits are
apparently not relied upon for Troy's priority motion. Because the exhibits
were not relied on and because the exhibits are said to show individually
what Exhibit 2014 shows collectively, we need not and have not considered
Exhibits 2038-2059.

- 8 -

IR000887

Interference 105,698



Exhibit 2014 shows various smaller photographs of a hand grip.

It is axiomatic that a moving party sufficiently explain how its evidence supports the arguments it makes. In that regard, and throughout its motion, an explanation of how Troy's evidence supports the arguments Troy makes is lacking or missing altogether. In every instance, such a lack of

- 9 -

IR000888

A1370

Interference 105,698

explanation is fatal to Troy. It is not up to the Board to sort through a moving parties' evidence and try to make a case for the moving party. To the extent that Troy invites us to do so, we decline the invitation. *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d. Cir. 1999) (declining invitation to scour record to make out a party's case). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Here, Troy does not explain which element(s) of the count is shown by which element(s) of the photographs of Exhibit 2014. For example, where are the lug rails with a plurality of gaps, the spaced apart lugs, and the detent assembly, as recited in Troy claim 3, which forms one alternative of Count 1? It is not apparent where those elements are shown. Count 1 is very specific with its elements and the elements relation to other elements. While there may be some resemblance between the photographs shown in Exhibit 2014 and Count 1, every element of the count must be accounted for. Troy has made no such accounting. It is not apparent to us and we do not find that Exhibit 2014 describes every element of Count 1.

Moreover, even if Troy has sufficiently demonstrated that Exhibit 2014 shows all of the elements of the count, which it has not, we disagree with Troy's argument (Paper 36 at 9:22-23) that Exhibit 2014 is of sufficient corroborating evidence to demonstrate that Troy actually reduced the invention to practice before the critical date. There are no apparent dates associated with Exhibit 2014. Moreover, there is no corroborating evidence, in the form of a non-inventor declaration for example, that the objects in the

- 10 -

IR000889

Interference 105,698

photographs were made by Mr. Troy and Mr. Samson as Troy alleges. In
that regard, we decline Troy's offer to request that the original prototypes be
made available (Ex. 2003, ¶ 23). Troy should have made available
everything that it would like for the Board to consider in connection with its
motion. In any event, we do not know, and Troy has not told us how having
the prototypes before us would help Troy. There would apparently still be
insufficient corroborating evidence that the prototypes were built by
Mr. Troy (and Mr. Samson) by the alleged date, or an explanation for how
the prototypes show all elements of Count 1.

Troy alternatively argues, on pages 6 and 9-10 of its motion, that the
prior sworn testimony made by Mr. Samson, and receipts from Valley
Plating, Inc., the Shot Show, and Applied Light, Inc. (along with the
photographs showing the engraving performed by Applied Light, Inc.)
corroborate the actual reduction to practice. (Paper 36 at 6:7-17 and 9:23 to
10:3). We have reviewed the receipts and photographs to which Troy directs
attention. First, there appears to be no Exhibit 2015, which we believe to be
the receipt from Valley Plating, Inc. That exhibit was deleted (see Paper
128; Troy Cumulative Exhibit List at 2), yet is still referenced in Troy's
motion (see paper 36 at 21, fact 23).

According to Troy's motion, Mr. Troy brought several of his
prototypes to Applied Light, Inc. for laser engraving of the company name,
Troy Industries, Inc. Exhibit 2017 is purportedly a receipt from Applied
Light, Inc. The receipt does describe "Laser engrave for show: 9 February
2004", however, there is not a description of what was engraved, let alone a

- 11 -

IR000890

A1372

Interference 105,698

description of the elements of the hand grip specified in Count 1.
Exhibit 2016 is a photograph allegedly showing the engraving performed by
Applied Light, Inc. Unfortunately, Exhibit 2016 is of poor quality and it
does not appear to show all elements of the count, nor does Troy explain
how Exhibit 2016 does show all elements of the count.

According to Mr. Troy's testimony, his "invention was favorably
received" at the Shot Show and he "took a number of orders" during the
show, directing attention to one invoice (Ex. 2003, ¶ 27; Ex. 2018). The
invoice is dated "2/18/2004" and under the description of what was sold has
the following under the "Qty" and "Description":

| QTY | Description |
|---|---|
| 1 | MRF – C Troy Carbine Free Float no non sense low Profile, military spec. rail forend |
| 1 | MRF – M Mid Length Carbines |
| 1 | P4 – C Predator P4 cantalievered Picatiny Rail Hanguard |
| 1 | MRS- C Troy Modular Rail System |
| 1 | MRS – M Troy Modular Rail System for Mid Length Carbines |
| 1 | Set of Troy Industries Folding Battle Sights (Front and Rear) |

Dealer Cost

Again, Troy has not explained the significance of the evidence. Moreover, a
purview of the above does not reveal what Troy asserts – that the invention
of Count 1, with all of its elements, was sold during the Shot Show.

- 12 -

IR000891

A1373

Interference 105,698

We have also considered Troy's argument that Samson has corroborated the existence of the prototype in prior sworn testimony. (Paper 36 at 9:23 to 10:1). We cannot make much sense of this allegation. First, Troy does not explain where there is support for the argument. What prior sworn testimony? Assuming Troy is referring to its Exhibit 2023 (Mr. Samson's prior testimony made during litigation), that exhibit is over one hundred fifty pages in length. We decline Troy's invitation to peruse the entire document. A cursory review of Troy's entire motion shows that Troy relies on the Samson testimony in only a few places, and in only one instance with respect to showing an actual reduction to practice. (Paper 36 at 21; MF 26; Exhibit 2023, 4-40:5-7). That portion of Mr. Samson's testimony is as follows:

Q     In fact, you attended the SHOT show to support Steve; isn't that correct?

A     Yes, I did.

We do not see how this testimony reveals to us what Troy suggests: that Mr. Samson provided prior sworn testimony corroborating an actual reduction to practice. In any event, even if the Samson testimony does provide corroborating evidence of the existence of *the prototype shown in Exhibit 2014*, for example, we have already explained why Exhibit 2014 is insufficient to establish that Troy actually reduced the invention to practice. Troy has simply not accounted for all of the elements of Count 1.

For these reasons, Troy has failed to show that it constructed an embodiment that met every element of the count and has therefore failed to

- 13 -

IR000892

A1374

Interference 105,698

sufficiently demonstrate an actual reduction to practice. Although not necessary to do so, we have reviewed Troy's arguments regarding testing of the prototype and also find those arguments unpersuasive. In that regard, Troy alleges that Mr. Troy mounted the prototype (e.g., the prototype shown in Ex. 2014) on an AR-15 type carbine and determined that it clamped securely to the barrel nut, without movement, and without touching the barrel. (Paper 36 at 6:13-15). As stated directly above, Troy has failed to sufficiently demonstrate that "the prototype" shown in Exhibit 2014 was constructed by Mr. Troy (and Mr. Samson) and that the prototype contained every element of the count. Therefore, Troy's arguments regarding testing of the prototype are necessarily insufficient. In any event, the testing element also requires corroboration. The evidence related to the testing of the prototype to which we are directed is limited to Mr. Troy's testimony. (Paper 36 at 6:13-15; Ex. 2003, ¶ 26).

Upon consideration of Troy's arguments and evidence as a whole, Troy has not sufficiently explained how the evidence shows an actual reduction to practice of the subject matter of Count 1. Moreover, based upon our own review of Troy's evidence as a whole, we do not see how the evidence shows an actual reduction to practice of the subject matter. Accordingly, Troy has not sufficiently demonstrated by a preponderance of the evidence a prior actual reduction to practice of the subject matter of Count 1.

- 14 -

IR000893

A1375

Interference 105,698

C.  Conception

To prove inurement or derivation, Troy must demonstrate that it
conceived of the invention.  Therefore, we consider Troy's conception
arguments.  Troy seeks to demonstrate a prior conception of the invention
by April 2003, and alternatively, on various other occasions between
April 2003 until early February 2004.

"Conception is the formation in the inventor's mind of a definite and
permanent idea of the complete and operative invention as it is thereafter to
be applied in practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir.
1998).  The inventor must recognize and appreciate the invention at the time,
i.e., there is no nunc pro tunc conception.  *Breen v. Henshaw*, 472 F.2d
1398, 1401 (CCPA 1973).  In establishing conception, a party must show
possession of every feature recited in the count.  *Davis v. Reddy*, 620 F.2d
885, 889 (CCPA 1980).  Corroboration is required to prove conception.
*Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

According to Troy's priority statement, its earliest corroborated date
of conception is April 2003.  (Paper 24).   We consider Troy's arguments
and evidence of events prior to April 2003 to the extent necessary for
understanding the argument that Troy had a corroborated conception by
April 2003.

Troy argues that it began working on a modular handguard for use on
a firearm in January 2003 and that during that time Troy made several
sketches of his design.  (Paper 36 at 3; Ex. 2003, ¶ 3).  According to Troy,
Mr. Troy entered into an agreement with Mr. Samson such that Mr. Samson

- 15 -

IR000894

Interference 105,698

would perform certain machine work for Mr. Troy. (Paper 36 at 3; Ex. 2003, ¶ 5). It was in April 2003, according to Troy's motion, that Mr. Troy disclosed his design concepts and drawings to Mr. Samson, including a drawing that Troy made in January 2003. (Paper 36 at 4; Ex. 2003, ¶ 5; Ex. 2004). Troy argues that these events and evidence establish a prior conception by April 2003. (Paper 36 at 2:16-17).

Neither Troy through its motion, nor Mr. Troy through his testimony, explains, in any meaningful way, the contents of Exhibit 2004 which is the drawing that was purportedly shown to Mr. Samson in April 2003. Exhibit 2004 is reproduced below:



Exhibit 2004 depicts a drawing of a modular handguard for a firearm. We have reviewed Exhibit 2004 and do not see how the exhibit shows every element recited in Count 1. Where, for example, are the lug rails with a plurality of gaps, spaced apart lugs, a detent assembly, or clamp assembly -

- 16 -

IR000895

A1377

Interference 105,698

all part of Count 1? None of those elements, nor their relationship with other elements as recited in Count 1, are clearly shown. Exhibit 2004 looks very different from the figures that are part of Troy's specification. Moreover, there is no independent corroborating evidence that the Exhibit 2004 sketch was made by Mr. Troy. Exhibit 2004 is not dated and Troy does not direct attention to independent corroborating evidence in the form of a declaration from a non-inventor, for example, to demonstrate that the sketch shown in Exhibit 2004 was made by Mr. Troy and communicated to Mr. Samson in April 2003.

Troy has not demonstrated by a preponderance of the evidence that it conceived of the invention by April 2003.

According to Troy's motion, Mr. Troy discussed his concept with David Beaudet, who in June 2003, prepared solid model images for Troy that further demonstrate a prior conception. Troy's motion directs attention to Exhibits 2001 and 2002. (Paper 36 at 4:10-14). Those exhibits are reproduced here:

IR000896

A1378

Interference 105,698



Troy Exhibit 2001 is a solid model image of a handguard.



Troy Exhibit 2002 is a solid model image of a handguard.

Troy argues that Exhibits 2001 and 2002 show the clamp to the barrel nut, the upper and lower portions of the handguard, cooling holes and a portion of the detent assembly. (Paper 36 at 4:14-15; Ex. 2003, ¶9). Even if we accept that those features are shown in Exhibits 2001 and 2002, Troy has

- 18 -

IR000897

Interference 105,698

not accounted for many other features of the count. For example, Count 1 requires a detent assembly carried by the clamp assembly, lug rails on an upper portion of the hand grip with a plurality of gaps, and spaced apart lugs extending from each edge of a lower portion of the hand grip. Troy does not sufficiently demonstrate how the Exhibits 2001 and 2002 show these elements of the count. Beaudet's testimony does not help Troy in that regard.

Beaudet testified that he made a drawing based on a competitor's model (an ARMS handguard), not based on a Troy concept. (Ex. 2007, ¶ 4). Neither Beaudet's declaration (Ex. 2007) nor those portions to which we are directed (Paper 36 at 4:4-14 and 19:3-15) of Beaudet's prior deposition testimony (Ex. 2024) provide an explanation that Mr. Beaudet made a drawing accounting for all of the elements of the count. The drawings that are attached to Beaudet's declaration to which Troy directs us to (Paper 36 at 4:15-18; Ex. 2007; attached "Ex. A", "Ex. B, Page 1", and Ex. B, Page 2") have not been explained. The parts shown are not labeled. The drawings appear different from the drawings that are part of Troy's specification. Moreover, according to Beaudet's declaration, at least two of the drawings attached to his declaration were made for "Scott" sometime in March 2004 (Ex. 2007, ¶¶ 6-7); not for Stephen Troy in June 2003 as Troy alleges.

Troy has not demonstrated by a preponderance of the evidence that it conceived of the invention by June 2003.

According to Troy's motion and Mr. Troy, Mr. Troy sent Mr. Samson two e-mails in July 2003 (Exhibits 2009 and 2010) containing detailed

- 19 -

IR000898

A1380

Interference 105,698

descriptions of improvements of the invention. (Paper 36 at 4:23 to 5:7).
Again, there is no explanation for how the e-mails describe the elements of
the count which is again detrimental to Troy's argument.

Exhibit 2009 is dated "2 Jul 2003." "Steve Troy" is listed in the
"From:" line and "Scott Samson" is listed in the "To:" line. While the e-
mail (Exhibit 2009) generally describes handguards; an "easier design which
would-completely replace the delta ring assembly" that includes "4 screws
with Belleville washers instead of two"; and a lower handguard; the e-mail
does not appear to describe any of the specific elements of the count.
Moreover, the picture attached to the email (Ex. 2009 at 2) is of very poor
quality. We cannot make much sense of this photograph other than it
appears to be a picture of a gun. Exhibit 2010 is dated "Friday, July 04,
2003." "Steve Troy" is listed in the "From:" line and "Samson" is listed in
the "To:" line. This e-mail (Exhibit 2010) refers to a "genius design for
attaching the rails that will not require inserts" and "plastic heat
shield/covers that snap in in place of the rails." Other than that, there is no
mention of any parts that are related to a firearm handguard, let alone the
specific elements of the count.

Troy has not demonstrated by a preponderance of the evidence that it
conceived of the invention by July 2003.

Next, Troy argues that it continued to work to refine its design from
April 2003 through November 2003 and that even more drawings were
prepared and developed, directing attention to Exhibit 2008 and Mr. Troy's
declaration. (Paper 36 at 4:21-23; Ex. 2003, ¶12). Again, neither Troy

- 20 -

IR000899

A1381

Interference 105,698

through its motion nor Mr. Troy through his declaration explains what is shown in Exhibit 2008 and therefore the argument is not persuasive.  Exhibit 2008 is reproduced below:



Exhibit 2008 depicts a modular rail forend

In any event, we have reviewed Exhibit 2008 and do not find a detent assembly carried by the clamp assembly, lug rails on an upper portion of the

- 21 -

IR000900

A1382

Interference 105,698

hand grip with a plurality of gaps, and spaced apart lugs extending from each edge of a lower portion of the hand grip. Moreover, Exhibit 2008 is undated and therefore does not provide independent corroborating evidence of a prior conception.

Troy has not demonstrated by a preponderance of the evidence that it conceived of the invention by November 2003.

In January 2004, according to Troy's motion and Mr. Troy, Troy hired Leed Himmell to prepare an extrusion die necessary for manufacturing of the handguard based on an extrusion print. (Paper 36 at 5:19-20; Ex. 2003, ¶ 19; Ex. 2011-2013). There is no explanation for what Exhibits 2011-2013 show or how they show or describe all elements of the count and therefore the argument is not persuasive. Moreover, it is not apparent to us how Exhibits 2011 and 2012 show all elements of the count. Where is the detent assembly carried by the clamp assembly, lug rails on an upper portion of the hand grip with a plurality of gaps, and spaced apart lugs extending from each edge of a lower portion of the hand grip? The receipt (Ex. 2013) also does not describe anything in particular as far as Count 1 is concerned and Troy does not demonstrate otherwise.

Troy has not demonstrated by a preponderance of the evidence that it conceived of the invention by January 2004.

Although we have addressed Troy's individual arguments and evidence that Troy alleges demonstrates a prior conception, we have also considered Troy's arguments and evidence regarding conception as a whole. Upon consideration of Troy's arguments and evidence as a whole, Troy has

- 22 -

IR000901

Interference 105,698

not sufficiently explained how the evidence shows a prior conception of the subject matter of Count 1. As explained, Troy simply has not explained how the evidence, either individually or collectively, shows all the limitations of Count 1. Moreover, based upon our own review of Troy's evidence as a whole, we do not see how the evidence shows a prior conception of the subject matter of Count 1. Accordingly, Troy has not sufficiently demonstrated by a preponderance of the evidence a prior conception of the subject matter of Count 1.

    D. Inurement

    Troy argues that Samson's actions inure to Troy's benefit. (Paper 36 at 11:20). "Inurement involves a claim by an inventor that, as a matter of law, the acts of another person should accrue to the benefit of the inventor." *Cooper v. Goldfarb*, 154 F.3d 1321, 1331 (Fed. Cir. 1998). "[T]o establish inurement, the inventor must show, among other things that the other person was working either explicitly or implicitly at the inventor's request." *Id.* at 1332. Inurement focuses on the nature of the relationship between the inventor and the other party. *Id.* Moreover, there are three other requirements that must be met to establish inurement: 1) the inventor must have conceived of the invention; (2) the inventor must have had an expectation that the embodiment tested would work for the intended purpose of the invention; (3) the inventor must have submitted the embodiment for testing for the intended purpose of the invention. *Genetech Inc. v. Chiron Corp.*, 220 F.3d 1345, 1354 (Fed. Cir. 2000).

- 23 -

IR000902

A1384

Interference 105,698

According to Troy's motion, Samson was hired by Troy to assist in the machining and manufacturing of the invention and on April 9, 2003 Samson signed a Confidentiality Agreement. Troy argues that between April 9, 2003 and early February 2004, there was no other agreement changing the relationship between Troy and Samson and that all "actions taken by Samson during the course of this relationship were on behalf of and for the benefit of Troy." (Paper 36 at 12:9-11).

Troy's argument is not specific or well articulated. We assume that Samson worked for Troy (Paper 36 at 12:22-23) based on the confidentiality agreement, during the time between April 9, 2003 and early February 2004. However, the confidentiality agreement (Ex. 2005) is not specific. It is a general agreement that provides that documentation and confidential business information that Troy furnishes to Samson remain the property of Troy Industries, Incorporated. (Ex. 2005, ¶ 1). The agreement does not set forth the specific work to be performed by Mr. Samson in the way of a hand grip, for example, let alone set forth the elements of the count or set forth that Samson was to manufacture the invention as defined by the count.

To the extent that Troy argues that the work Mr. Samson performed with Mr. Troy was an actual reduction to practice, that argument has already been addressed and rejected. Specifically, Troy has not sufficiently demonstrated that the work performed by Mr. Samson and Mr. Troy resulted in an actual reduction to practice as already explained.

Troy argues that any testing done by Samson was in connection with the intended purpose of the invention and inures to Troy's benefit.

- 24 -

IR000903

Interference 105,698

(Paper 36 at 13:5-6). Troy also argues that all actions taken by Samson relating to diligence and reduction to practice inure to Troy's benefit. (Paper 36 at 13:9-10). We do not know to which testing, diligence, or reduction to practice Troy is referring. Troy does not explain, in any meaningful way, what it means in that regard. For these reasons, Troy has not sufficiently demonstrated that Samson performed any acts of inurement. In any event, because Troy has not established by a preponderance of the evidence that it conceived of the invention, there can be no inurement.

    E.  Derivation

       To prove derivation, a party must establish conception of the claimed subject matter and communication of the conception to the opponent. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). As with conception, corroboration is required to support testimony of the communication. *Id.* at 1196. *See also Davis v. Reddy*, 620 F.2d 885, 889 (CCPA 1980).

       As explained above, Troy has not sufficiently established that it conceived of the invention by the alleged dates. Therefore, to the extent that Mr. Troy has established that it did communicate on several occasions with Mr. Samson, Troy has not established that that which was communicated was a conception of the subject matter defined by the count. Accordingly, Troy has not established that Samson derived the subject matter of the count.

    F.  Conclusion

       Troy has not demonstrated by a preponderance of the evidence a prior actual reduction to practice. Troy has also failed to demonstrate a prior

- 25 -

IR000904

Interference 105,698

conception and therefore has failed to prove derivation or innurement.

Accordingly, Troy Priority Motion 1 (substitute) is DENIED.

## III. SAMSON PRIORITY MOTION

Troy has not sufficiently demonstrated by a preponderance of the evidence priority of invention prior to Samson's accorded benefit date. Therefore, Samson's priority motion to establish an earlier date than its accorded benefit date is moot.

Accordingly, Samson Priority Motion 1 is DISMISSED.

## IV. TROY MISCELLANEOUS MOTION 2

Troy moves to exclude Samson Exhibits 1001-1007, 1012-1016, 1018-1020, 1046-1050, 1070-1082, 1086, and 1087 (Paper 72 at 2). The exhibits that Troy seeks to exclude were relied on by Samson in support of Samson Priority Motion 1 (Paper 37), Samson Opposition 1 (Paper 61) and Samson Reply 1 (Paper 64).

Since Troy failed to sufficiently demonstrate priority of invention by a preponderance of the evidence there was no occasion to reach Samson's opposition, Samson's priority motion or Samson's reply or consider Samson's exhibits 1001-1007, 1012-1016, 1018-1020, 1046-1050, 1070-1082, 1086, and 1087 in relation to those papers.

Therefore, Troy miscellaneous motion 2 is DISMISSED.

## V. SAMSON MISCELLANEOUS MOTION 3

Samson moves to exclude Troy Exhibits 2003, 2004, 2005, 2008, 2011, 2012, 2015-2021, 2025-2035, 2037, and 2062. Since Troy failed to sufficiently demonstrate priority of invention by a preponderance of the

- 26 -

IR000905

Interference 105,698

evidence, there was no occasion to reach Samson's opposition, Troy's reply, Samson's priority motion, Troy's opposition, or consider Exhibits 2025-2035, 2037, and 2062 in relation to Troy's opposition and Troy's reply. Therefore, Samson's request to exclude exhibits 2025-2035, 2037, and 2062 is DISMISSED.

We find it unnecessary to consider the specific objections to the admissibility of Troy's exhibits 2003, 2004, 2005, 2008, 2011, 2012, 2015-2021[8], since Troy has failed to demonstrate priority by a preponderance of the evidence even assuming Troy's exhibits 2003, 2004, 2005, 2008, 2011, 2012, 2016-2021 to be admissible.

Accordingly, Samson's miscellaneous motion 3 is DISMISSED.


VI. ORDER

For the reasons given, it is

**ORDERED** that "TROY PRIORITY MOTION 1 (SUBSTITUTE)" is DENIED;

**FURTHER ORDERED** that "SAMSON PRIORITY MOTION 1" is DISMISSED;

**FURTHER ORDERED** that "TROY MISCELLANEOUS MOTION 2" is DISMISSED; and

**FURTHER ORDERED** that "SAMSON MISCELLANEOUS MOTION 3" is DISMISSED.

---

[8] As already explained, Troy does not apparently rely on Exhibit 2015.

IR000906

Interference 105,698

1    (cc via electronic mail):
2
3        Attorney for Troy:
4
5        Ann Lamport Hammitte, Esq.
6        Thomas P. McNulty, Esq.
7        Lando & Anastasi, LLP
8        One Main Street
9        Cambridge, MA 02142
10
11       Tel: 617-395-7000
12       Fax: 617-395-7070
13       Email: ALHPatents@LL-A.com
14       Email: TPMPatents@LL-A.com
15
16       Attorney for Samson:
17
18       Stephen J. Holmes, Esq.
19       Joshua A. Stockwell, Esq.
20       Barlow Josephs & Holmes, Ltd.
21       101 Dyer Street
22       5th Floor
23       Providence, RI 02910
24
25       Tel: 401-273-4446
26       Fax: 401-273-4447
27       Email: sjh@barjos.com
28       Email: jas@barjos.com

- 28 -

IR000907

A1389

BoxInterferences@uspto.gov                                        Paper 204
Telephone: 571-272-4683                               Entered: 6 January 2011

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

---

STEPHEN P. **TROY**
Junior Party
(Patent No. 7,216,451),

v.

SCOTT W. **SAMSON**
and KENNETH LANKARGE
Senior Party
(Application No. 11/326,665).

---

Patent Interference No. 105,698 (SCM)
(Technology Center 3600)

*Before* RICHARD E. SCHAFER, JAMESON LEE, and SALLY C.
MEDLEY, *Administrative Patent Judges.*

MEDLEY, *Administrative Patent Judge.*

**Judgment – Bd.R. 127**

IR000909

A1391

1    Troy has failed to prove priority of invention (Paper 203).

2    Accordingly, it is

3        **ORDERED** that judgment is entered against Troy for Count 1

4    (Paper 1 at 4);

5        **FURTHER ORDERED** that claims 1-13 of Troy's involved patent

6    are CANCELED, 35 U.S.C. 135(a); and

7        **FURTHER ORDERED** that a copy of this judgment be entered in

8    the administrative records of the involved Troy patent and Samson

9    application.

IR000910

A1392

1    (cc via electronic mail):
2
3        Attorney for Troy:
4
5        Ann Lamport Hammitte, Esq.
6        Thomas P. McNulty, Esq.
7        Lando & Anastasi, LLP
8        One Main Street
9        Cambridge, MA 02142
10
11       Tel: 617-395-7000
12       Fax: 617-395-7070
13       Email: ALHPatents@LL-A.com
14       Email: TPMPatents@LL-A.com
15
16       Attorney for Samson:
17
18       Stephen J. Holmes, Esq.
19       Joshua A. Stockwell, Esq.
20       Barlow Josephs & Holmes, Ltd.
21       101 Dyer Street
22       5th Floor
23       Providence, RI 02910
24
25       Tel: 401-273-4446
26       Fax: 401-273-4447
27       Email: sjh@barjos.com
28       Email: jas@barjos.com

IR000911

A1393

# United States Court of Appeals
## for the Federal Circuit

*Troy v Samson Manufacturing Corp., LLP,* 2013-1565

### CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NELSON KINDER + MOSSEAU PC, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **November 14, 2013** counsel for Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Laura Carroll
Zachary Rush Gates
Howard Susser
Burns & Levinson, LLP
125 Summer Street
Boston, MA 02110
617-345-3000
lcarroll@burnslev.com
zgates@burnslev.com
hsusser@burnslev.com

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

November 14, 2013                                    /s/ John C. Kruesi, Jr.
                                                     Counsel Press

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   __X__   The brief contains  13,975  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

   _____   The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   __X__   The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

   _____   The brief has been prepared in a monospaced typeface using MS Word 2002  in a ___ characters per inch_____ font.

November 14, 2013_____     (s) /s/ Damian R. LaPlaca_____
Date                       DAMIAN R. LAPLACA
                          NELSON KINDER + MOSSEAU PC
                          *Counsel for Plaintiff-Appellant*